**TOMBIGBEE CONSTRUCTORS et al.,**

v.

The **UNITED STATES.**

No. 194–65.

United States Court of Claims.

Jan. 23, 1970.

John A. McWhorter, Washington, D. C., for plaintiffs. Arthur D. Condon, Washington, D. C., attorney of record. King & King, Davies, Richberg, Tydings, Landa & Duff, Washington, D. C., of counsel.

Lawrence S. Smith, Washington, D. C., with whom was Asst. Atty. Gen., William D. Ruckelshaus, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## ON ASSIGNMENT OF ERRORS

PER CURIAM:

This case was referred to Trial Commissioner David Schwartz with directions to prepare and file his opinion on the issues raised by the Assignment of Errors * of the parties. The commissioner has done so in an opinion and report filed on April 1, 1969, wherein such facts as are necessary to the opinion are set forth. Requests for review by the court of the commissioner's opinion, report and recommended conclusion were filed by both parties. The case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court agrees with the commissioner's opinion, report and recommended conclusion, with minor modifications, it hereby adopts the same, as modified, as the basis for its judgment in this case as hereinafter set forth. Therefore, both plaintiff's and defendant's Assignments of Errors by the Armed Services Board of Contract Appeals are denied and the petition and counterclaims are dismissed.

Commissioner Schwartz's opinion, with minor modifications by the court, is as follows:

Plaintiff contractor was unsuccessful before the Armed Services Board of Contract Appeals in two claims for an equitable adjustment for costs increased by reason of alleged changed conditions in the course of the performance of the contract by the subcontractor. Plaintiff now brings suit on these two claims for the benefit of the subcontractor, to review and set aside the findings of the Board and, alternatively, for breach of contract.

---

* The Assignment of Errors procedure under which the case was submitted by the parties has been superseded by Rules 94–100 [since September 1, 1969, Rules 161–167]. The commissioner's opinion and report was submitted pursuant to Rule 99 (c) [since September 1, 1969, Rule 166 (c)].

Plaintiff was successful in two other claims, on which the hearing was limited to the question of entitlement. After negotiations between the parties as to the amounts involved, the government paid plaintiff the sum of $14,805 on one of these claims and $65,308 on the other. The government, alleging error by the Board in its rulings on each of these claims, has counterclaimed for the sums paid. Plaintiff in its reply to the counterclaim pleads a denial and an accord and satisfaction.

In this court an order was entered, on the government's unopposed motion in pretrial proceedings, that a trial *de novo* should not be held, and that the proceedings be limited to a review of the administrative record before the Board pursuant to the standards of the Wunderlich Act, 41 U.S.C. §§ 321, 322. The claims of error by the Board presented here are made by assignment of errors in the Board's decision, a procedure predating that provided in Chapter XIV of the Rules of the court for review of cases under the Wunderlich Act.

*The Claim for the Consequences of the Flooded Borrow Pit*

Plaintiff contracted with the Air Force in March 1957 to construct runways and taxiways at Columbus Air Force Base in Mississippi. The contract contained an item of approximately 500,-000 cubic yards to be excavated and back filled with borrow, at 50 cents per cubic yard. Soon after the work started, there was discovered a subgrade layer of clay, unsuitable for taxiways. It was agreed that the clay had not been shown in the boring logs and charts furnished by the government to the contractor, and that it could not have been anticipated. The parties further agreed that the clay should be removed and backfilled, and this was done by the plaintiff. The parties disagreed, however, on whether the work was routine excavation and backfill, to be done at the contract rate of 50 cents per cubic yard, or should be paid for at a higher rate.

The government finally recognized that the work on the layer of clay was an extra, calling for a higher price, and a new price was negotiated and agreed upon, at a meeting in Mobile on November 19, 1957.

Modification No. 6 to the contract, embodying the agreement for the extra, was signed on the next day. On November 19, however, the borrow pit at the Base, designated in the contract papers as a source of borrow for backfilling, was unbeknownst to the parties flooded by heavy rain which fell on that day. The flood and the unavailability of an alternative source of borrow, plaintiff contends, caused a delay in the work through the winter, until May of 1958. Plaintiff claims the amount of its costs allegedly increased in consequence of the delay.

The payments specified by Modification No. 6 have been made and are not in suit. Also not in suit is the additional time, by reason of the flood, required to complete the work. The contractor received an appropriate extension of time. The claim concerns other costs, allegedly increased by virtue of the flood, such as those of equipment left idle from November to May and the costs of enlarging the borrow pit in an unflooded direction—which was eventually done—to make available the needed quantity of borrow material.

The Board found that Modification No. 6 gave plaintiff full payment for the extra work connected with the layer of clay; that while the Modification did not cover the costs resulting from the flood in the pit, such expenses resulted not from the existence and discovery of the clay but from rain, an act of God not the fault of the government, for which plaintiff was entitled only to the extension of time which it received.

Plaintiff contends that the Board acted without substantial evidence and unlawfully in rejecting the claim for increased costs. Plaintiff claims that the government's failure to disclose the layer of clay was a breach of contract leading

to delayed performance, for which the damages are the costs of the delayed performance beyond the period of winter rains and floods. The damages were caused, it is said, first, by the government's refusal, for a time, to recognize that the clay was a changed condition and that the work was an extra, followed, when the government did recognize the changed condition and the extra, by a flood in the designated borrow pit, the only one available. The flood, it is said, delayed the work through the winter months of another year.

In response, the government urges, as the Board found, that Modification No. 6 was an agreement by plaintiff to accept 94 cents per cubic yard as complete payment for the work required by the excavation of the clay and the necessary backfill, and thus for the entire claim based on the changed condition and the extra. Plaintiff counters that Modification No. 6, itself an agreement, is voidable for a material mutual mistake of the parties as to a factual premise on which it was negotiated and signed. The Modification is said to have been based, by both parties, on the premise of the continuing availability of borrow, necessary for the job, in the pit designated in the contract documents. Since the pit was on the day of the negotiations flooded, and no alternative source of borrow was available, Modification No. 6 falls. More specifically, plaintiff argues that had the flood been known to the parties on that day, they would not have agreed to the 94 cent rate but would have agreed to another, higher rate, presumable including plaintiff's increased costs, or they would not have reached any agreement, until the increased costs became known. Continuing plaintiff's theory: no alternative source of borrow was available from November 1957 to May 1958, thereby delaying the conclusion of the work until the fall of 1958. The costs of equipment idle during this period thus become recoverable. Eventually, plaintiff expanded the pit to make available the needed quantities of dry borrow; the costs of the expansion are also said to be recoverable.

Plaintiff in effect seeks rescission of Modification No. 6 for a material mutual mistake of fact, and an equitable adjustment or damages, which would include the costs attributable to the changed condition. Alternatively, plaintiff seeks reformation of Modification No. 6, to reflect the flooded condition of the pit by an award of damages in the increased amount of its costs, over 94 cents, caused by the flood. The crux of plaintiff's position is its attack on Modification No. 6. If the Modification stands, plaintiff's case falls.

The Board found that the flooding of the borrow pit was not the result solely of the heavy rain which occurred on November 19; that there had been two or three days of unusually heavy rain preceding November 19 "and in fact work had been suspended at the base for three days in the week before the 19th;" that the rain which occurred on November 19 "was heavier than usual" and that the flooding of the borrow pit was the cumulative result of the several heavy rains which had fallen up to and through the nineteenth. So much for findings on the facts of the rain and the flood, as distinguished from the parties' awareness of the facts.

The Board did not make a finding on the question raised by plaintiff in this court—whether the parties made their agreement on the mutually mistaken premise or assumption of fact that the pit was unflooded. The finding, limited to the parties' knowledge of the rain, was that while they were negotiating on November 19th, the parties knew of the rains prior to that day and of the suspension of work on account of rain, but did not know of, and did not take into account, the flood in the pit:

> The parties at the meeting in Mobile were aware of previous weather conditions and of the suspension of work on account of them. They did not, however, know at the time of their negotiations leading to Modification No.

6 that the borrow pit had become flooded and did not take that fact into account in their negotiations for the price of the extra work.

This finding is of course not a finding on whether the designated pit was believed to be the only available pit, was believed to be unflooded or available, or was a premise or even important to the parties in their negotiations and agreement. Plaintiff's case, to be successful, requires a conclusion that both parties negotiated, on November 19th, on the premise that the pit was the only reasonably available source of borrow and that it would remain available, that is, in relation to the facts of the case, unflooded. In my opinion the evidence is to the contrary. Plaintiff's claims are thus without merit.

First, it is not shown that any mistaken belief or premise which may have been held on behalf of plaintiff was shared by the government. The only testimony on the subject was that of the engineer who represented the government in the negotiations in Mobile on November 19. Asked whether he had considered the season or the time of the year, he answered that he could not remember the details of the meeting but that he always considered the season or the time of the year, and that the contractor always sees to it that the government's representative does consider the season. He said he was sure that he did in this case consider the season of the year because he always did. Further:

Q. Do you recall whether any particular consideration was given in this particular conference to the then existing weather in Columbus, Mississippi?

A. I don't know that it was even considered.

Q. If it were known that it had been raining for several days up there, do you think it would have been considered? Was it your normal procedure?

A. Yes, if it had been known.

It appears that the thought of a flooded or an unflooded pit or an available source of borrow was not even in the mind of the negotiator for the government, much less was it his factual premise. The generality of the testimony negatives any possible conclusion that an unflooded pit was, for the government, the premise or predicate of its negotiations and agreement on November 19.

Second, it does not appear that such a premise was in the mind of the plaintiff. The president of the subcontractor said, in support of such a premise, that "this inundation [of the borrow pit] took place on the 19th, and none of us were aware of it;" that "We never would have reached an agreement if we had been aware of this situation." The testimony was given in these circumstances. The witness had apparently concluded his answer to any pending questions. There followed a lengthy colloquy between the presiding board member and the government. The witness then asked whether he "could add something that I think I should have said," and he then gave the testimony quoted above. Such afterthought testimony is not impressive. The Board may reasonably have denied it weight, and, in my opinion, it is not deserving of weight here, insofar as plaintiff seeks relief not within the jurisdiction of the Board.

Moreover, the president could speak only of his own knowledge of the flood. His job superintendent, who also testified, gave evidence, confirmed by Weather Bureau records, as demonstrates beyond doubt that plaintiff knew before the day of the negotiations that the pit was on the verge of flooding, and could not have negotiated in the belief or on the premise that the pit was the only available source of borrow and would remain available, unflooded.

The superintendent testified as follows:

Q. Now, while you were in Mobile reaching this agreement, is it not true that unusually heavy rains occurred at the site of the field in Columbus, Mississippi?

A. Yes.

MR. ROWE: You are speaking of the 19 November agreement?

MR. CONDON: Yes, sir, 19 November 1957.

What was the effect of the rain, in terms of what it did to the site?

THE WITNESS: Well, we must concede, as Mr. Satterwight brought out in his answer, there was more than one rain. There were some rains on preceding dates and the Tombigbee River got out of its bounds.

BY MR. CONDON:

Q. That got out of its banks?

A. Yes.

Q. As a result of this, is that correct, of the particularly heavy rain on November 19th?

A. No, to be honest, the river had been rising. There had been some rain which caused a tributary creek, contiguous to the construction to overflow its banks, and overflowed a rim of this large borrow pit, from which not only was the unclassified borrow to come, in the amount of 500,000 yards, but the selected backfill. It topped the rim of the borrow pit and inundated it.

Q. To a depth, would you say?

A. We cut ten or twelve feet. You could drive as close as possible, and see a rock sticking out in a lake.

Q. What effect did that inaccessability have on Smith's operation? These heavy rains made the borrow pit inaccessible for the purpose intended?

A. Inaccessible, and subsequently stopped our working.

Q. Did the discussion on November 19th at Mobile include a reference to this heavy rainfall of the same day that was taking place in Columbus, Mississippi?

A. No, sir.

Q. Therefore, the price of 94 cents per cubic yard, that was arrived at on that day, did not take into consideration the fact that the borrow pit was inaccessible and unuseable. Is that a correct statement?

A. That is a correct statement.

The witness thus admitted that *before* the day of the negotiations a tributary creek of the Tombigbee River, contiguous to the construction, had overflowed its banks and "overflowed a rim of this large borrow pit," which was to be the source of all the borrow; that it "topped the rim of the borrow pit and inundated it." Accordingly, plaintiff knew that the pit was already partly flooded. Work was suspended because of prior heavy rainfall. This testimony makes it all but impossible that a premise of plaintiff's negotiations on November 19 was a belief that the pit would remain unflooded, or that the pit was the only available source of borrow, or both, or that plaintiff would not have agreed to Modification No. 6 except on such a premise.

If confirmation were necessary that the rainfall prior to November 19 put plaintiff on notice of possible flooding, it was provided by the Weather Bureau records of the rainfall at the Base during the month of November. The records, introduced by the government, showed that 1.42 inches of rain fell in Columbus, Mississippi, the site of the Base, on November 19. It had, however, rained during nine of the first nineteen days in November, and during five of the six days prior to November 19. The cumulative six-day rainfall, from November 13 through November 18, was 5.08 inches, brought to a total of 6.50 inches by the 1.42 inches which fell on the 19th. Heavier rain than 1.42 inches had fallen during two of the six days prior to the 19th. On the 14th and on the 18th, the rainfall had been 2.52 and 1.74 inches, respectively. It rained again on the 21st and 22nd, slightly, and on the 25th, there was again a rainfall larger than on the 19th —1.61 inches. The November total was 10 inches.

The section entitled "Floods" in the summary for the month, in the Weather Bureau record, reads as follows:

## FLOODS

The U.S. Geological Survey reported that streamflow was record high for November throughout the State. All major streams were at or near flood state for almost the entire month, but no outstanding floods occurred. Flooding of lowlands occurred in the Tombigbee River basin and along some of the streams in Pearl and Pascagoula River basins; property damage was minor and no loss of life was reported.

The evidence is abundant that plaintiff had notice, prior to the beginning of the negotiations on November 19, that the pit might become flooded, could not have negotiated on the premise that the pit would remain unflooded and was not surprised by such additional or complete flooding as resulted from the 1.42 inches of rain on November 19.

■■ Having such notice, plaintiff assumed the risk of flood or, at least, did not in the contract put the risk on the government. Plaintiff may therefore not rescind or seek to reform the November 19 agreement on a claim of ignorance of the flood on that date. While a mutual mistake on which a contract is premised—assuming there was one here—ordinarily serves to rescind a contract (Restatement of Contracts, § 603 (1932); 3 Corbin, Contracts, § 614 (1960 ed.); 5 Williston, Contracts, § 1544 (rev. ed.)), a contract is not challengeable at the instance of a party who assumed the risk of the mistake; a loss may not be shifted by one upon whom the contract put the risk. Restatement of Contracts, § 502, comment (f), *supra*; 3 Corbin, Contracts, § 598, *supra*; 5 Williston, Contracts, §§ 1547–1549, *supra*. Compare authorities to the same effect, in connection with the right to reformation in cases of mutual mistake. National Presto Industries, Inc. v. United States, 338 F.2d 99, 108–112, 167 Ct.Cl.

749, 764–769 (1964), cert. denied, 380 U.S. 962, 85 S.Ct. 1105, 14 L.Ed.2d 153 (1965); Flippin Materials Co. v. United States, 312 F.2d 408, 415, 160 Ct.Cl. 357, 368 (1963).

■■ As to the precise risk here involved, it may first be noted that bad weather such as unusually heavy rainfall is ordinarily an act of God; the Government does not assume the risk of rainfall or flood by making a change which causes the contractor to marshal men and equipment so as to be delayed by a heavy rain. Warren Brothers Roads Co. v. United States, 105 F.Supp. 826, 828, 123 Ct.Cl. 48, 78–79 (1952). Neither party to a contract is responsible to the other for the damages caused by an act of God, where the contract is silent as to the allocation of the loss to one or the other party. Arundel Corp. v. United States, 103 Ct.Cl. 688, 711–712, cert. denied, 326 U.S. 752, 66 S.Ct. 90, 90 L.Ed. 451 (1945). Under the contract, the flood entitled plaintiff only to an extension of time, and he received such an extension.

There is accordingly no basis for shifting to the Government the loss caused to plaintiff by the rain and the flood. An unflooded pit was not the premise of the contract even for plaintiff, and the contract reached by the parties left the risk of flood where it fell and the loss from flood unremediable. The fact of the matter seems to be that plaintiff seized on the coincidence that the pit was fully flooded on the day of the negotiations, to create a claim of rescission or reformation for mutual mistake of fact. Earlier, plaintiff had argued, among other things, that the flooding took place *after* November 19 and was a breach of an implied warranty that borrow would remain available throughout.

Plaintiff's case is defective, also, in hinging on the contention that another part of the claimed premise for the negotiations was its belief that the pit in question was the only source of borrow. The contention does not hold up under scrutiny.

While the pit in question was designated in the contract, it was to be only one possible source of borrow material. The contract specifications refer to the "borrow pits indicated on the drawings or selected by the Contractor, as provided hereinafter" (para. 2–03(c), set out in the appendix hereto); to "the borrow areas indicated on the drawings or * * * areas selected by the Contractor and approved by the Contracting Officer" (para. 2–04(a), appendix, *infra*). The specifications further provided that "Borrow material shall be obtained from the borrow areas indicated on the drawings, or from sources selected by the Contractor, subject to the approval of the Contracting Officer" (para. 2–06, appendix, *infra*). The Government correctly relies on these phrases as authorizing the use either of the designated borrow pit or any other source approved by the contracting officer. On the flooding of the designated pit, the Government contends plaintiff had the option of waiting to use the designated pit when the flood subsided, with an extension of time covering the delay, which was granted, or, if this would tie up expensive equipment, plaintiff was entitled to find another source of borrow and present it for approval. The choice was appreciated by the plaintiff at the time, and it did not present an alternative source.

A search for alternative sources of borrow was made prior to the flood, when the parties were still at odds over whether the work required to remove the clay deposit would be regarded as an extra and paid for at a higher rate than ordinary excavation and backfill. The search made at that time was not exhaustive. Most of the excavation and backfill covered by the Modification was, in fact, done with the use of the designated borrow pit, before the Modification was negotiated. After the pit was found to be flooded, the plaintiff made further searches for an alternative source of borrow. None was found. The plaintiff waited for the flooded pit

to drain, and finally drained and expanded it sufficiently to serve.

The Board found that "There were three potential alternative sources which were carefully examined and found to be unsatisfactory either because the material in them was unsuitable or because of their location." The first and second sources were unsuitable because of the nature of their contents, and because the government by reason of obligations to other contractors would not permit the plaintiff to use them. A third source was located, off the Base. Roads would have had to be built to it and royalties paid for its use. Upon learning of these factors affecting costs of using the pit, plaintiff abandoned inquiries and negotiations for its use. The Board noted that there was no evidence on whether the contents of the third source would have been suitable, and that, "In the absence of such evidence we are unable to say whether appellant was under any obligation to use it or to negotiate for its use." However these findings are reconciled, plaintiff cannot show that on November 19, it had, and agreed to Modification No. 6 on the basis of, a belief that the pit designated in the contract was the only available source of borrow. The incomplete nature of the search, as of November 19, is inconsistent with such a belief. At all times, the designated pit was not the only contractually permissible source, and as of November 19 there were other possibilities not yet fully explored. Plaintiff's theory must be revised to read that the predicate of the agreement was a mutually mistaken belief of the parties that the designated pit would continue to be available throughout, or that some other economical source of borrow would on a complete search become available; that when it appeared that the pit was flooded and a search for alternative sources was made without success, the predicate of the agreement fell and the agreement fell with it. Nothing in the record tends to show such an elaborate belief in the minds of the parties as a predicate for

the agreement they made on November 19, 1957.

### The Claim for the Required Use of Friable Borrow Material

■ The government, in the course of the work, claimed the right to approve the borrow material used by plaintiff. It directed the contractor not to use random material excavated from the borrow pit, and it approved the use only of friable material. Plaintiff's second claim is that the requirement that it use friable materials only was beyond the terms of the contract and thus entitled plaintiff to the extra costs it thereby incurred.

The Board denied the claim on the ground that the government was merely exercising its rights under paragraphs 2–06 and 2–10 of the specifications. Plaintiff is not complaining that the government abused a right to require the use of friable material, but only that it purported to exercise such a right. The question is thus one of construction of the contract. The Board upheld the government; it found that paragraphs 2–06 and 2–10 authorized the government to require that the backfill used be suitable, and, in some cases, explicitly "friable;" that the requirement of the use of friable gravel "was simply the requirement of compliance with paragraphs 2–06 and 2–10 of the specifications," and that "It does not appear that any condition in addition to these requirements was imposed."

Paragraph 2–06 of the specifications (appendix, *infra*) in its first sentence provides that: "Borrow material shall be selected to meet the requirements and conditions for the particular embankment or· backfill for which it is to be used." Paragraph 2–10 (appendix, *infra*) provides that: "Embankments shall be formed from earth or friable materials * * *." Earth is, of course, a crumbly or friable materials. Also relevant is paragraph 2–03(c) (appendix, *infra*) which provides: "Unclassified borrow shall consist of excavating approval

[sic] material from the borrow pits indicated on the drawing or selected by the Contractor, as provided hereinafter."

Plaintiff's claim falls, on the language of the contract documents. The Board was correct in its reading of the contract. Plaintiff contends that the Board ignored the "unqualified" nature of the second sentence of paragraph 2–06, which states that "Borrow material shall be obtained from the borrow areas indicated on the drawings, or from sources selected by the Contractor, subject to the approval of the Contracting Officer." Plaintiff is urging that the pit having been approved by its designation in the contract, the government had no further right of approval of material taken from the pit. The contention is frivolous. The first sentence of paragraph 2–06, quoted above, provides for selection of borrow material suitable for the job for which is will be used and by itself disposes of plaintiff's claim. The second sentence, on which plaintiff relies, provides for the use of a designated or an approved borrow pit. Both sentences can and should be given effect, as relating to different subjects, by the time-honored principle of construction that harmonizing effect should wherever possible be given to all the provisions of the contract, to avoid making any single provision inoperative or meaningless. Hol-Gar Manufacturing Corp. v. United States, 351 F.2d 972, 979, 169 Ct.Cl. 384, 395–396 (1965); Restatement of Contracts, § 236, *supra*. The first sentence provides for approval of material, and the second for approval of the pit. It would be unreasonable to read the two sentences as permitting the use of any material found in an approved pit, however unsuitable. Plaintiff's construction would, moreover, be inconsistent with paragraph 2–10, which explicitly requires earth or other friable material for embankments, and paragraph 2–03 (c), which provides generally that unclassified borrow shall consist of approved material from the designated pit. Both pit and material were subject to approval by the government.

Plaintiff's claims in this court are without merit, the Board committed no error, and the petition should be dismissed.

### The Counterclaim for Acceleration Costs

In May of 1958, the government's resident and area engineers met with the prime contractor on the site and requested an acceleration of the work scheduled for June. The purpose of the acceleration, according to the government, was to avoid an extension of the work into another winter or, according to plaintiff, to prepare taxiways for the anticipated arrival of some tanker planes. The work was done as requested, by the subcontractor for whose benefit the suit is brought. Thereafter, in August of 1958, a written directive was issued for a further or continued acceleration. This work, too, was done. The costs of this second acceleration were then negotiated with the contractor, and paid.

Claim was made to the Board for the increased costs allegedly incurred by the subcontractor in the first acceleration, in June. The Board upheld the claim, and the issue of damages having been postponed, the parties negotiated the amount involved and determined it to be $14,805. The government made payment to plaintifff, and in this suit by plaintiff on the claims which were rejected by the Board, the government has counterclaimed for the $14,805.

The record made before the Board is the record in this case, and its presence readily permits examination of the counterclaim on its merits. Consideration of the plaintiff's plea to the counterclaim— an accord and satisfaction by the payment of the $14,805—perhaps logically the first question for disposition, would require a hearing to determine the facts underlying the claimed accord and satisfaction. Compare Cannon Construction Co., Inc. v. United States, 319 F.2d 173, 162 Ct.Cl. 94 (1963) with Construction Service Co. v. United States, 357 F.2d 973, 976–978, 174 Ct.Cl. 756, 762–765 (1966). It is appropriate first to examine the merits of the counterclaim. On examination, it appears that the Board did not err in holding for plaintiff. The plea of accord and satisfaction need not be considered.

Several witnesses testified that the government had not ordered or directed, but merely "requested" the June acceleration. The Board saw no difference between a request and an order, and held the plaintiff's subcontractor entitled to an equitable adjustment reimbursing it for its increased costs. The grounds of the decision were that the initiative came from the government, the governmen benefitted, and the work was done in a manner different than required by the contract:

> We are unable to see any difference between a request and an order under the circumstances. The initiative came from the Government for the Government's convenience. It makes no difference whether appellant complied willingly or unwillingly, or whether or not it also benefited from the compliance. This was work done in a manner different from that required by the contract. Appellant is entitled to reimbursement for it.

The government claims that the Board erred in failing to find, on the "uncontradicted evidence" that plaintiff agreed to do the June work at no additional cost to the government. The contention is thus that plaintiff was a volunteer in the simple sense of one who recognizes, and agrees, that the work he will do will be without compensation.

Relevant testimony was given by three witnesses. The first of the three, the subcontractor's superintendent, testified as follows:

> Q. May 28, 1958, the resident engineer requested the contractor to speed up the work. You were not present at that conference?
>
> A. I arrived on the job that day. I was not at the conference.
>
> Q. Did you have any conversation with anybody in the Government or

any prime contractors' representatives about that meeting?

A. I immediately had a meeting with the prime contractor and questioned them about the propriety of agreeing to this thing at no cost to the Government, and it could evaluate it on cost, and why we couldn't preserve our rights if it became costly, to check the tab to the Government. My conversation was with the prime contractor.

Q. Then you are not in a position to say from your personal knowledge whether in the meeting that took place between the Government representatives and the contractor's representatives on this question, the work that was to be done by Smith in the speedup, was covered in the arrangement?

A. I cannot say from my personal knowledge that it was alluded to as part of the work.

The second witness was the government's area engineer in Mobile, who was present at the May 28 meeting. He testified as follows:

Q. Since the prime contractor was on schedule, and you had no authority to expedite him, then the only thing you could do was request that he cooperate with you to get out faster.

A. That is exactly what we did.

Q. That was what we did? Is it your recollection the contractor agreed to do this voluntarily?

A. Yes, sir.

Q. Do you know whether or not anybody directed the contractor to expedite at that time?

A. Not to my knowledge.

The third witness was the government's resident engineer on the job, in whose office the meeting of May 28 was held. At the meeting, he said, the contractor left the room with his people, presumably after being asked to expedite the work, and on his return "told us that he would take measures to expedite the work and to give it to us by the contract completion date, or what other date we wanted." Asked, "Was the contractor directed to do that or requested to do it? he replied, "He was requested to take measures to expedite the work." He then testified that in August "the Government directed him to expedite even more (the examiner's words)" and that he, the witness, participated in the negotiations for the settlement of the amount payable for the August work Counsel for the government then examined as follows:

Q. I was in those negotiations, also, Mr. Crowder, and I want to ask whether your recollection is the same as mind [sic] on one point. In those negotiations, did the contractor again agree that the period, 28 May, to the date of the written directive, should not be included but was done on his responsibility?

A. That is correct.

The foregoing "uncontradicted" testimony did not require a conclusion by the Board, and does not require a conclusion here, that plaintiff agreed that the work should be done without cost.

The government would read the superintendent's testimony that immediately after the meeting he questioned the prime contractor "about the propriety of agreeing to this thing at no cost to the Government" as an admission that the prime contractor had at the meeting agreed to do the work at no cost. This is not the testimony. The question of agreement seems still to be open, from the words: "it [the contractor] could evaluate it on cost, and why we couldn't preserve our rights if it became costly, to check the tab to the Government." The witness seems to have been talking prospectively, and critically, about a possible future agreement to do the work at no cost. The witness was not asked what the prime contractor had said he had said at the meeting. The words "agreeing to this thing at no cost to the Government" cannot be attributed to the prime contractor and read as his statement and thus an admission that he had agreed to do the work without charge.

As for the two engineers, though both were present at the May 28 meeting, neither was asked whether anything was said at that meeting, and if so by whom and what, on the subject of payment of costs or of who would bear the costs of the work to be accelerated.

The area engineer did little more than say "Yes, sir" to a series of leading questions: he agreed with counsel's statement that "the contractor agreed to do this voluntarily."

■ The resident engineer said "That is correct" to the statement of examining counsel for the Government that *counsel* recollected that in the August negotiations, the contractor "again" agreed that the June work "should not be included [presumably in the payment to be made] but was done on his responsibility." No testimony had been given of a first agreement, yet counsel stated his own recollection that the contractor had "again" agreed, and in effect asked his witness to agree with him. The examiner was giving information instead of asking for it. His question was even more leading than the classic question, in the action for assault: Where was the plaintiff standing when the defendant hit him? A question which assumes a fact not conceded or not yet in evidence is not only leading, it is misleading as well. See I Morgan, Basic Problems of Evidence 53 (1954). Answers to questions so egregiously leading are more than improper and objectionable; they are not probative. The Board should not have credited, and apparently did not credit the testimony as evidence of an agreement to do the work without pay.

The Board was entitled to conclude, on the testimony of the three witnesses, that there was no proof of an agreement that the contractor would do the work without charging for it. The decision therefore cannot be overturned on the only ground urged by the Government— that the Board ignored uncontradicted evidence compelling the conclusion that plaintiff agreed to do the work at no cost.

*The Counterclaim for Costs of Compaction*

■ The second counterclaim would reverse the decision of the Board for plaintiff on its claim for the costs of achieving the last 5% of compaction of the subgrade of taxiway shoulders. The contract required compaction to a density of 95%. The Board found that: "No difficulty was encountered with 90% compaction, but the 95% compaction developed to be impossible for practical purposes. It was achieved, but only after great effort and the use of a variety of special equipment. Even then, progress was slow and the work was greatly delayed by this requirement." The Board concluded: " * * * we find it to be the fact that it was impossible to achieve this density and still comply with the performance schedule of the contract. It is undisputed that the parties did not anticipate the difficulty that was encountered in this respect. Appellant is entitled to reimbursement for the additional expenses attributable to it."

As in the case of plaintiff's acceleration claim, the Board decided only the question of entitlement. The amount payable was then negotiated, agreed to be $65,308, and the government made payment to plaintiff. The government has here counterclaimed for this sum, on the ground that the Board's decision on impossibility is unsupported by substantial evidence and is therefore erroneous in law. The plaintiff has pleaded a denial and an accord and satisfaction, as it did to the government's first counterclaim. As in the first counterclaim, the pleas need not be gone into, for the second counterclaim, too, is without merit.

About halfway through the job, the government, by a change order, directed the addition, to the top six inches of subgrade of 6% by volume of Portland cement. Thereafter, compaction was not a problem. Payment was made of the cost of the cement and of the work of adding it, and is not in issue. The gov-

ernment's major point is that the Board was required, and failed, to recognize that performance was possible, from the fact that plaintiff achieved the 95% compaction in performing the first half of the job, prior to the addition of the cement. The testimony cited in support is to the effect that 95% compaction was achieved, slowly, with difficulty and great cost, with the use of a variety of equipment and without possibility of meeting the construction schedule. The government's argument seems to be based on the incorrect assumption that the Board found 95% compaction to be impossible; the Board found it to be "impossible for practical purposes" to achieve "and still comply with the performance schedule."

The Board in its opinion found that the addition of cement "added strength and stability to the soil;" that thereafter "the work was more easily completed;" and, finally, that "the addition of the cement obviously produced a condition in the subgrade soil which permitted ready compaction of a strength and density sufficient to serve the purpose for which it was required." Before the Board, plaintiff's position was that the addition of the cement constituted a recognition by the government of the fact that the required compaction could not be achieved without cement, within the time set by the contract. The government argued, to the contrary, that the addition of the cement was suggested by plaintiff and was motivated entirely by a desire to hasten the completion of the work over the schedule in the contract. The Board did not explicitly reject the government's contention, or adopt the plaintiff's although it found the fact which plaintiff urged that the government had recognized by the direction to add the cement, i. e., that the required compaction could not be achieved within the specified time.

The government continues to take the position that the addition of cement was suggested by the plaintiff and was in-tended to expedite the work. Even if this were accepted as true, it would not be inconsistent either with the conclusion that the addition of cement was a recognition of the practical impossibility of achieving 95% compaction in the time set, without the cement, or with the simpler, ultimate conclusion of the practical impossibility of achieving the required compaction in the time set in the contract.

A variation of the govenment's contentions is that it was not literally and physically impossible to achieve 95% compaction. This is true enough; 95% compaction was in fact achieved prior to the addition of cement. The Board did not find to the contrary; its decision is based on the practical impossibility of achieving 95% compaction within the time set by the contract. The Board found that the last 5% of compaction was so difficult, costly and time-consuming as to be practically or commercially impossible to achieve in the time set by the contract. The holding is within the doctrine of Natus Corp. v. United States, 371 F.2d 450, 178 Ct.Cl. 1 (1967) and Clark Grave Vault Co. v. United States, 371 F.2d 459, 178 Ct.Cl. 52 (1967). These cases establish that the practical impossibility which may ground a decision granting an equitable adjustment does not require literal impossibility.

Finally, the government urges that the Board lacked substantial evidence for its finding that it was impossible for practical purposes to achieve 95% compaction and still comply with the performance schedule of the contract. This is not so. There was testimony that the job was difficult, that a great variety of equipment was used to compact the soil, that a great deal of time was expended, that the job would never have been completed in the period contemplated by the contract without the addition of the cement, and that after the cement was added the government ceased making compaction tests, presumably recognizing that compaction was

**1050**

no longer a problem. The government does not point to any evidence in the record tending to show that 95% compaction could have been achieved for the entire job, without the addition of cement, in the time period allowed in the contract.

The government has treated the question of practical impossibility as a finding by the Board on a matter of fact, and entitled to finality in this court, under the Wunderlich Act, 41 U.S.C. §§ 321, 322, if supported by substantial evidence. To the extent that the Board's finding is composed of conclusions of fact, it is supported by substantial evidence. The government has not met the heavy burden of showing that the evidence to the contrary is overwhelmingly to the contrary. Koppers Co. v. United States, 405 F.2d 554, 558–559, 186 Ct.Cl. 142, 150–151 (1968). To the extent that the conclusion of the Board was a matter of law (see Natus Corp. v. United States, *supra*; Clark Grave Vault Co. v. United States, *supra*), the question is open to review here. The Board was in my opinion correct, and I reach the same conclusion. The Board did not hold, as the government contends, that costliness and difficulty in performing a contract, alone, excuses performance and warrants an equitable adjustment.

## CONCLUSION

In conclusion, the challenges of both plaintiff and defendant to the Board's decision are not well-grounded. The challenged conclusions of law are correct and the challenged findings of fact are supported by substantial evidence and consequently under the Wunderlich Act final against the claims made in the petition and in the defendant's counterclaims.

Both plaintiff's and defendant's assignments of errors by the Armed Services Board of Contract Appeals are denied and the petition and the counterclaims are dismissed.

*Appendix*

*Excerpts from the Contract Specifications*

SECTION 2—EXCAVATION, EMBANKMENT, AND PREPARATION OF SUBGRADE.

\* \* \* \* \* \*

2–03. *DEFINITIONS:*

\* \* \* \* \* \*

(c) *Unclassified Borrow.* Unclassified borrow shall consist of excavating approval [sic] material from the borrow pits indicated on the drawings or selected by the Contractor, as provided hereinafter, and disposing of the excavated borrow material.

(d) *Embankment.* Embankment shall consist of placing the excavated materials hereinbefore defined in embankments and miscellaneous backfills, including backfills around structures.

\* \* \* \* \* \* .

2–04. *EXCAVATION:*

(a) *General.* \* \* \* Fill material required in excess of that produced by normal grading operations shall be excavated from the borrow areas indicated on the drawings or from areas selected by the Contractor and approved by the Contracting Officer. Excavated material not acceptable to the Contracting Officer for use as fill shall be disposed of on the reservation as directed by the Contracting Officer.

\* \* \* \* \* \*

2–06. *SELECTION OF BOTROW [sic] MATERIAL:* Borrow material shall be selected to meet the requirements and conditions for the particular embankment or backfill for which it is to be used. Borrow material shall be obtained from the borrow areas indicated on the drawings, or from sources selected by the Contractor, subject to the approval of the Contracting Officer. \* \* \*

\* \* \* \* \* \*

2–10. *EMBANKMENTS:* \* \* \*
Embankments shall be formed from earth or friable materials free from roots or other organic material, trash, frozen material, and rock or stones having a maximum dimension greater than 3 inches. \* \* \*