MaddeN, Judge,
delivered the opinion of the court:
On June 29, 1951, the plaintiff made a contract with the United States for construction work at O’Hare Field near Chicago, Illinois. The Government had invited separate bids on three items of work, and the plaintiff was the successful bidder on two of the items. One was for the construction of the so-called Eeadiness Building. That item is not involved in this suit. The other item was for the construction of the “outside utilities” for the Eeadiness Building and for the Alert Hangar. The construction of the Alert Hangar itself was awarded to another contractor. The “outside utilities” part of the plaintiff’s contract is the one out of which this suit arises.
In submitting its bid of $152,000 and making its contract for the outside utilities work, the plaintiff was misled by a bid submitted to it by a subcontractor for the electrical part of the outside utilities work, which subcontractor had been misled by a bid submitted to it by a sub-subcontractor. The sub-subcontractor’s mistake was that it estimated only for labor and included nothing for materials.
*795 The plaintiff’s bid and the circumstances did not indicate any mistake. The next highest bid was only $155,284. This may have been because of the same mistake by the same would-be sub-subcontractor. If so, the Government’s representatives had no knowledge of it. The plaintiff says that its suit is not based upon the mistake in its bid and does not seek reformation of its contract.
One part of the plaintiff’s outside utilities electrical work under its contract was the installation of electrical facilities between the Alert Hangar and manhole No. 2, a distance of about 3,500 feet. The plaintiff was to install new underground ducts for the entire distance, and place electric cables in the ducts. The value of this work, based upon what it would' have cost the plaintiff to do it, plus overhead and profit, would have been $60,690.
The contract contained the usual article authorizing the contracting officer to make changes within the scope of the contract and providing for an equitable adjustment of the contract price if changes were made. It also contained the usual article prescribing the procedure to be followed in case of a dispute. These contract provisions are quoted in finding 4.
On July 6, 1951, just a few days after the contract was signed, the contracting officer advised the plaintiff of a proposed change eliminating the underground ducts in the work described above, and providing that, for a part of the distance, the electrical cables would merely be buried in the ground, and for the rest of the distance they would be strung on poles above ground. Since the substituted construction would be less expensive than the underground duct construction, the contracting officer requested the plaintiff to submit a credit proposal for the labor and materials involved in the change. On July 26 the contracting officer issued a f ormal change order, which the plaintiff accepted by endorsement. That document stated that an equitable adjustment reducing the contract price would be determined at a later date. The plaintiff performed the work in accordance with the change order. The cost of this part of the work as changed was estimated to be $19,180, and the plaintiff does not contest the correctness of that figure. That left a difference of *796 $41,510 between the value of the work as originally contracted for and the value of the work as changed.
In August 1951, the plaintiff proposed to credit the Government with $18,000 for the change. In its proposal it called attention to the error in the subcontractor’s bid. The Government’s representatives, apparently thinking that the plaintiff was asking for consideration on account of the mistake in its bid, rejected the plaintiff’s proposal and said that the relief sought by the plaintiff could not be obtained from anyone short of the Comptroller General, and that if the plaintiff desired to submit the question to that office, that could be done through the contracting officer’s office.
The plaintiff was then and is still of the opinion that it was not entitled to relief because of its unilateral mistake in the making of the contract. It did not, therefore, submit the question to the Comptroller General. The Government’s representatives in all their discussions with the plaintiff maintained the position that the equitable adjustment should be based upon the difference in cost between the work as originally contracted for and the work as changed. They had, before they first notified the plaintiff of the proposed change, made estimates of the two sets of costs, showing the difference of $41,510. However, they continued to negotiate with the plaintiff, in the hope that a procedure under the disputes article could be avoided. No agreement having been reached, the contracting officer, on June 20, 1952, made his formal determination of the equitable adjustment. He fixed it at $41,510, and the payment to the plaintiff for its contract work was reduced by that amount.
In October 1952, the contracting officer issued his findings. The plaintiff appealed through the proper channels, ultimately to the Secretary of the Army. The Secretary’s representative ,the Armed Services Board of Contract Appeals, on October 1, 1954, affirmed the decision of the contracting officer. The plaintiff says that its action was arbitrary.
The plaintiff points to its losses under the outside utilities electrical portions of its contract. However, its losses would have been the same if the change order had not been issued, since it finds no fault with the contracting officer’s figures as to the costs as they would have been without the change *797 order and the costs as they were under the change order. The plaintiff suggests that the change order was not permissible under the contract. If that were true it would be immaterial since, as appears above, the change order did not increase the plaintiff’s losses. In any event, the change was “within the scope of the contract” and was accepted by the plaintiff. The only dispute was in regard to the amount of the equitable adjustment.
The plaintiff says that, of the mistakenly small amount of $34,800 which it estimated for all of the outside electrical work in making its bid, only $22,564.32 was properly applicable to the line from the Alert Hangar to manhole No. 2. It says that the $19,180 actual cost of the changed work should have been subtracted from the $22,564.32, and only the difference of $3,384.32 should have been deducted from the plaintiff’s contract price. We think the $22,564.32 figure is of no significance. It is only an allocation of a proportionate part of a larger sum which was itself grossly inadequate because of the mistake in the bid. The plaintiff’s attempt to use it is only another way of seeking reformation of the contract on account of its unilateral mistake in making the contract. As we have seen, the plaintiff disclaims, rightly we suppose, any entitlement to a direct reformation of the contract on account of the mistake. We think it is not entitled to use its mistaken estimated figures, which have no relation to actual costs, in determining the equitable adjustment.
The plaintiff’s petition will be dismissed.
It is so ordered.
Laramore, Judge/ LittletoN, Judge/ and Jones, Chief Judge, concur.
Whitaker, Judge, took no part in the consideration and decision of this case.
FINDINGS OF FACT
The court, having considered the evidence, the report of Commissioner Paul H. McMurray, the briefs and arguments of counsel, makes findings of fact as follows:
1. Plaintiff, an Illinois corporation having its principal place of business in the City of Chicago, has sued to recover *798 the sum of $41,510, which the defendant determined to be an equitable reduction in the amount originally provided in plaintiff’s contract for work to be done at O’Hare Field, Illinois. The reduction in cost was based upon changes made with respect to the outside electrical installations.
2. On June 29, 1951, plaintiff and the defendant, (acting through the Corps of Engineers, United States Army), entered into contract DA-ll-032-Eng-684 for the construction of the so-called Keadiness Building, and for the installation of outside utilities for that building and the Alert Hangar, at O’Hare Field, Illinois, for the sum of $361,000. Four bids were submitted for three items of construction, consisting of (1) construction of the Readiness Building complete with utilities, (2) construction of the Alert Hanger complete with utilities and (3) outside utilities for both of these buildings. Building utilities were to extend five feet beyond the building walls and outside utilities were to be installed beyond the five foot point. These bids were as follows:
Name of bidder Item I Item 2 Item 3 Total
S. N. Nielsen Oo_ $209,000 $406,000 $152,000 $766,000
Welso Construction Co... 216,862 376,041 165,234 747,137
Midland Constructors..... 216,000 396,000 216,000 826,000
Michael J. McDermott & Co., and Standard Paving Co... 418,000 379,000 0) 767,000
Defendant’s Estimate... 168,776 373,889 187,600 720,264
The defendant’s estimate was prepared by Deleuw, Gather & Company, of Chicago, Architect Engineers, who were employed under contract by the United States Corps of Engineers.
Items 1 and 3 were awarded to plaintiff in the amount of $361,000, and item 2 was awarded to the Welso Construction Company under a separate contract.
3. The contract provided that work should be commenced within 15 calendar days after the receipt of notice to proceed and be completed for beneficial occupancy by January 15, 1952, with final completion by May 15, 1952. The contract work, including changes required by the defendant, was *799 satisfactorily completed and there is no dispute in respect to any delay in performance.
The contract price was increased in the amount of $19,-157.32 by change orders 2 to 11 inclusive and reduced by the sum of $41,510 under change order No. 1. The plaintiff has been paid the net balance of $338,647.32. Approximately 85 percent of all work was subcontracted and the plaintiff’s total cost of performance was $366,771.41.
4. The contract provided in part as follows:
3. Changes and Extras. — The Contracting Officer may at any time, in writing, and without notice to the sureties, order extras or make changes in the drawings and/or specifications of this contract providing such extras or changes are within the general scope thereof. If any such extra or change causes an increase or decrease in the amount due under this contract, or in the time required for its performance, an equitable adjustment shall be made and the contract shall be modified in writing accordingly. Any claim of the Contractor for adjustment under this Clause must be assei’ted in writing within 30 days from the date of receipt by the Contractor of the notification of extra or change: Provided, however, That the Contracting Officer, if he decides that the facts justify such action, may receive, and act upon any such claim asserted at any time prior to the date of final settlement of the contract. If the parties fail to agree upon the adjustment to be made the dispute shall be determined as provided in Clause 6 hereof. But nothing provided in this clause shall excuse the Contractor from proceeding with the prosecution of the work as changed.
* * ‡ &
6. Disputes. — Except as otherwise specifically provided in this contract, all disputes concerning questions of fact which may arise under this contract and which are not disposed of by mutual agreement, shall be decided by the Contracting Officer, who shall reduce his decision to writing and send by registered mail, return receipt requested, a copy thereof to the Contractor at his address shown herein. Within 30 days, from the receipt thereof, the Contractor may appeal in writing to the Chief of Engineers, whose written decision thereon, or that of his designated representative or representatives, shall be final and conclusive upon the parties hereto unless, within 30 days after receipt thereof by the Contractor, he appeals in writing to the Secretary *800 of tbe Army, which appeal shall operate to vacate said decision of the Chief of Engineers. If the dispute is determined by the Secretary of the Army, his written decision, or that of his designated representative or representatives, shall be final and conclusive upon the parties hereto. The Chief of Engineers or the Secretary of the Army may designate an individual, or individuals, other than the Contracting Officer, or a board, as his authorized representative to determine appeals under this article. In any proceeding under the provisions of this article, the Contractor shall be afforded an opportunity to be heard and offer evidence in support of his appeal. * * *
A summary computation of performance, as prepared by Johnson, Atwater & Co., is as follows:
Cost of performance:
Subcontractors_$303,278. 74
Less: Backcharges_ 2,426. 36
$300, 852.38
Labor_ 21, 572. 04
Material_ 9,339.21
Warehouse .charges:
Labor- 642.24
Material, lumber, etc_ 5,194. 49
Equip. & Truck rental_ 7,495.22
Tools & supplies_ 1, 863. 21 15,195.16
Gen. Exp. — taxes, ins_ 7,434.04
Fuel_ 1,627. 77
Less: Gas tax
refund_ 53.40
1,574.37
Total job cost_ 355,967.20
G & A Exp. — allocated on basis of all job costs_ 10, 804.21
- $366,771.41
Receipts:
Contract price_ 361, 000. 00
Add: Change orders 2 to 11 incl_ 19,157.32
380 157. 32
Less: Change order No. 1_ 41,510. 00
- 338,647.32
Net loss oh performance_ 28,124.09
5. Under the original specifications and contract drawing 71-03-41 the performance of outside utilities called for the installation of electric facilities between the Keadiness Building and the Boiler House, and from manhole No. 12 at the Alert Hangar to manhole No. 2, a distance of approxi *801 mately 3,500 feet. The electric cable between the Readiness Building and the Boiler House was to be installed in part through existing underground ducts and in part through a new 4-inch steel conduit, whereas the cable between the Alert Hangar and manhole No. 2 called for the installation of new underground ducts for the entire line.
By Revision “A” of drawing 71-03-44, approved June 25, 1951, the underground ducts for the line between the Alert Hangar and manhole No. 2 were eliminated and in lieu thereof a direct burial cable line was provided for approximately 2,000 feet from the Hangar area where clearances were critical, and an additional overhead pole line of approximately 1,700 feet was provided where no hazard to flying.operations would result. There was no change in the cable line between the Readiness Building and the Boiler House. Defendant prepared an estimate of the cost for the installation of the underground duct line originally specified from the Alert Hangar to manhole 2, dated July 6,1951, in the amount of $60,690, which included overhead of 10 percent and profit of $5,369, amounting to 10 percent of costs other than payroll insurance. Defendant also prepared an estimate of the cost of such work, as changed under Revision “A”, including allowances of 10 percent for overhead and 10 percent for profit, in the total sum of $19,180, resulting in an indicated saving to defendant of $41,510.
The defendant’s original estimate made by DeLeuw, Cather & Company, for this work as called for before the change order was issued, was $73,176.
6. By letter of July 6,1951, defendant submitted ten prints of drawing 71-03-44 containing Revision “A”, substituting the burial cable and overhead pole line for the underground duct and cable system between the Alert Hangar and manhole No. 2, and requested that plaintiff submit a credit proposal for the labor and materials involved in the change.
On July 26, 1951, the contracting officer issued Change Order No. 1, part I, which reads in part as follows:
Delete the underground ducts and primary cable for the alert hangar and substitute an overhead electric distribution line and direct burial cable in accordance with Drawing No. 71-03^4, sheets 1 and 2 of 2 sheets, *802 Eevision “A”, dated 25 July 1951, which are hereby made a part of the contract drawings. (1)
An equitable adjustment in price which will result in a decrease in Item No. 2 of the Unit Price Schedule and in the total contract amount, due to the changes ordered herein will be determined at a later date, and a supplemental Change Order, Part II to this Change Order, will be issued. The ten-day period within which the Contractor may protest will begin upon receipt by the Contractor of Part II of this Change Order. (2)
The plaintiff accepted the foregoing change order by appropriate endorsement thereon.
7. The plaintiff’s bid estimate included $46,500 for all electrical work under its contract, but no detail of estimates was furnished with the bid submitted. It provided $11,700 for all electrical installations in the Eeadiness Building under bid item No. 1, and $34,800 for all outside electrical installations under item 3 of the bid schedule. The plaintiff’s bid was based upon a proposal of Owl Electric Company, of Chicago, Illinois, and a subcontract was entered into with that company, dated July 3,1951, for the installation of all electrical work inquired under plaintiff’s contract for $45,500.00.
The Owl Electric Company subsequently advised plaintiff that it had relied upon a bid of the A. A. Electric Company for the installation of substantially all of the outside electrical work but such company had withdrawn its bid and declined to accept the work because the bid was based upon labor only and did not include any estimate for material. Thereafter, when change order No. 1 was issued, the plaintiff relieved Owl Electric Company of its obligation under its contract covering the outside electrical installations, and entered into a separate contract with Owl Electric Company for the inside electrical installations in the Eeadiness Building only at the price of $11,500.
The plaintiff did not attempt to hold Owl Electric Company responsible upon its original contract because of the change in the work ordered by the Government and because *803 Owl Electric Company was not financially able to bear tbe cost of the materials required for the outside electrical installations.
When the contract was amended by Change Order No. 1, it became necessary for the plaintiff to secure an electrical subcontractor who had a contract with a Pole Line Electrical Union to perform the pole line construction work because no other Union of Electrical Workers was permitted to perform such pole line construction.
The plaintiff sought to subcontract the outside electrical work to the next highest bidder, Welso Construction Company, which bidder also declined because it said that it had made an error in its bid.
Thereafter the plaintiff negotiated with the Contracting and Material Company of Evanston, Illinois, for the performance of all outside electrical work, as revised by the Government under Change Order No. 1 for the price of $63,680, and a subcontract was executed by them dated October 29, 1951.
8. The contracting officer received no breakdown of the bids for the several items upon which bids were submitted, and the difference in the total amount of bids received were not so great as to indicate error.
The inadequacy of plaintiff’s bid for the outside electrical work was first brought to the attention of the defendant about July 6, 1951, after the proposed change in this work was sent to the plaintiff. On or about August 1,1951 defendant was informally advised by plaintiff that its original bid was based upon an erroneous electrical subcontract price of $34,800.
Welso Construction Company told the plaintiff that its item 3 bid was also based upon an erroneous quotation for the outside electrical work.
9. On August 6, 1951, the plaintiff submitted, by letter, a proposal to the District Engineer for a credit allowance of $12,600 to the Government for the change in the installation of outside electrical work. The letter stated that the proposed adjustment was based upon plaintiff’s figures for the work and requested consultation with Government repre *804 sentatives for the purpose of arriving at an equitable adjustment under Change Order No. 1.
A meeting was held on or about August 23,1951, for such purpose and at that time plaintiff submitted a letter proposal for a credit allowance of $18,000, with the explanation that the outside electrical work had been subcontracted at $34,000 but that the subcontractor would be unable to perform its contract because of an error in its bid.
The plaintiff’s proposal of $18,000 credit allowance for the change was rejected by the District Engineer’s Legal Branch, by letter of November 2, 1951, reading in part as follows:
We have been unable to secure favorable action on the submittal just made covering your case and same was returned without approval. This office has been advised that the relief requested could not be granted by any one short of the Comptroller General. Should you desire to seek relief from that office, a revised sub-mittal through this office should be made on that basis, i. e., request equitable relief of the General Accounting Office.
The plaintiff did not seek relief through the Comptroller General, and does not now seek relief because of an error in its bid, but claims that an equitable adjustment for the change in the work performed should be based upon its contract and its bid allocations for the changed work.
10. The defendant had prepared cost estimates upon the original outside electrical work and revision of the work under Change Order No. 1 prior to July 6, 1951, when the proposal was first sent to plaintiff. In the negotiations thereafter the defendant’s representatives always contended that an equitable adjustment should be based upon the difference in cost of the work originally specified and the cost of the work as revised under Change Order No. 1, but they continued negotiations and delayed making the final determination because they desired to arrive at an agreed settlement, if possible, and thus avoid a protest by the plaintiff.
The plaintiff’s representative was advised by Mr. Nus-baum, Chief, Construction Division, to make the plaintiff’s best offer and he would do all he could to obtain a settlement. *805 Tbe plaintiff believed that an equitable adjustment could be agreed upon through a negotiated settlement.
On June 20, 1952, when the work had been substantially completed, the contracting officer issued Part II of Change Order No. 1, wherein the amount determined as an equitable adjustment was a reduction of item 2 of plaintiff’s contract price schedule, and of the entire contract amount, in the sum of $11,510.
The plaintiff rejected this determination of the contracting officer, by endorsement thereon, which reads as follows:
REJECTION OE MODIFICATION
The foregoing modification of said contract is NOT accepted and hereby is rejected for good and sufficient reasons, including but not restricted to the following: (1) It does not represent an “equitable adjustment” m the contract price in accordance with the terms of the contract; (2) The proposed deduction of $41,510.00 by reason of the changes ordered in Change Order No. 1 is not based on the contract price but is based on the Government’s estimate of the cost of performance of the work which estimate was prepared prior to the date of the said contract and constitutes no part of the contract price of performance of the work prior to the change order; (3) The proposed deduction of $41,510.00 in the contract price overall is largely in excess of the total amount included in the contract price for the performance of all of the work required by the particular specifications in which the change was made by Change Order No. 1 as to which notice was duly given before this proposed adjustment order dated June 20, 1952, was issued; (4) This proposed change order was not issued in the uncontrolled and independent discretion of the contracting officer but has been issued pursuant to instructions and directions of higher military authority and which instructions and directions are erroneous and inequitable both in law and fact; (5) By Change Order No. 1 the character and scope of the contract work was so greatly changed as to deprive the contractor of its legal rights to recover damages from its electrical subcontractor for refusal to perform; and (6) The proposed deduction is so grossly erroneous, arbitrary and capricious as to imply bad faith.
*806 11. On October 14,1952, the contracting officer issued findings of fact and his determination that an equitable adjustment for the revision of the outside electrical work under Part II of Change Order No. 1, was a reduction of $41,510 in the original amount of plaintiff’s contract.
The plaintiff timely appealed from the determination of the contracting officer, and was afforded a hearing before a three-member Corps of Engineers Claims and Appeals Board, Department of the Army, on April 2, 1953. On November 12, 1953, this Board issued its decision which, by a majority of 2 to 1 affirmed the determination of the contracting officer.
Thereafter plaintiff appealed to the Secretary of the Army and this appeal was denied by the Armed Services Board of Contract Appeals October 1, 1954. Twelve members of the Board voted to affirm the action of the contracting officer and the prior decision, and four members dissented without preparing any written dissenting opinions.
12. The Government’s estimate prepared by DeLeuw, Gather & Company for the original work under item 2 of plaintiff’s contract (item 3 of the bid schedule) was $187,600, and included $113,814 for the installation of all outside electrical work, of which $40,638 was estimated for such installations from the Beadiness Building to the Boiler House, which was not changed, and $73,176 was estimated for electrical installations between the Alert Hangar and manhole No. 2, which was modified by Change Order No. 1.
The plaintiff’s bid analysis for item 2 of its contract was $152,000, and included $34,800 for all outside electrical work. In the plaintiff’s bid analysis, no allocation of this $34,800 was made as between the area outside the Beadiness Building and the area outside the Alert Hangar.
Part II of Change Order No. 1, and the determination of the contracting officer, resulted in a reduction of $41,510.00 in the plaintiff’s contract price. This reduction was the difference in the value of the electrical work originally specified and as modified for installation between the Alert Hangar and manhole No. 2. It was arrived at on the basis of estimates prepared by the District Engineer’s office under date of July 6,1951, as follows:

*807
Original basis As modified

Labor_ $16,275 $4, 626.00
Materials. 32,537 10,820.53
Direct costs_ 48,812 15,446.53
Overhead allowance at 10%_:_ 4,881 1,544.65
Profit allowance at 10%_ 5,369 1,699.12
Payroll insurance and taxes- 1,628 489.70
Totals compared_ 60, 690 19,180.00
13. The plaintiff does not contest the Government’s estimates as the fair and reasonable value of the original work deleted and the work as modified under Change Order No. 1.
CONCLUSION OE LAW
■Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is not entitled to recover, and the petition is therefore dismissed.

 Items 1 and 3 combined.

Footnotes: (1) Revision "A” of drawing 71-03-44 is dated June 25, 1951. (2) Item 3 of the bid schedule became item 2 of plaintiff’s contract schedule, and the decrease in the amount resulting from the change had already been computed by the District Engineer's office at $41,510 by July 6, 1951 or earlier.