PACIFIC ARCHITECTS AND ENGI-
NEERS INCORPORATED and Advanced Maintenance Corporation

v.

The UNITED STATES.

No. 298–72.

United States Court of Claims.

Jan. 23, 1974.

Loren R. Rothschild, Los Angeles, Cal., attorney of record, for plaintiff.

David R. Schlee, Washington, D. C., with whom was Acting Asst. Atty. Gen. Irving Jaffe, for defendant.

Before KASHIWA, KUNZIG, and BENNETT, Judges.

## OPINION

### PER CURIAM:

This case comes before the court on defendant's motion, filed October 2, 1973, requesting that the court adopt, as the basis for its judgment in this case, the recommended decision of Trial Judge Philip R. Miller, filed August 14, 1973, on the parties' cross-motions for summary judgment pursuant to Rule 166(c), plaintiff having failed to file a request for review by the court of said recommended decision within the time provided by the Rules of the court therefor. Upon consideration thereof, it appears that plaintiff has also failed to timely respond to defendant's motion of October 2, 1973, and since the court agrees with the trial judge's recommended decision, without oral argument, it hereby grants defendant's motion and adopts the said decision as the basis for its judgment in this case. Accordingly, plaintiff's motion for summary judgment is denied, defendant's like cross-motion is granted and plaintiff's petition is dismissed.

## OPINION OF TRIAL JUDGE

MILLER, Trial Judge: The petition herein seeks payment of $38,424.52. The claim is derived from a contract with the Air Force for the operation of food service facilities at Vandenberg Air Force Base, California, for an 11-month period commencing November 1, 1968.

Item 1 of the contract provided for preparation of an estimated 1,290,247 meals at facilities on the Base, for service at dining halls, missile sites and remote areas throughout the Base at a unit price of $.30785. Item 2 called for preparation of an estimated 118,959 meals at an in-flight kitchen at a unit price of $.246455. The originally estimated total price was $426,520.58, but the contract was modified to add a special additional mess facility and meals due to a flood in January and February 1969, which increased the estimated contract price to $430,406.13.

Reflecting the fact that costs could vary with increases and decreases from the estimate, the contract contained pro-visions for adjustment to wit:

### PART IV. CHANGE IN PRICE BASED ON VARIATION FROM ESTIMATE

#### (Oct. 1959):

a. If the actual number of meals served under this contract, to other than Contractor personnel, varies from the number of meals estimated (in accordance with (b) below) to be served during any calendar month, the price paid the Contractor for meals served in that month shall be adjusted in accordance with the following formula:

| If actual meals served during month is following percent of estimated meals for month | Price for meals served will be the following percent of basic contract price subject to the limitations in Column 3 | Total payment shall not |
|---|---|---|
| 70-84 | 112 | Exceed 84% est reqmts x 108% basic price |
| 84-92 | 108 | Exceed 92% est reqmts x 104% basic price |
| 92-100 | 104 | Exceed est reqmts x basic price |
| 100-110 | 94 | Be less than est reqmts x basic price |
| 110-120 | 93 | Be less than 110% est reqmte x 94% basic price |
| 120-130 | 92 | Be less than 120% est reqmts x 93% basic price |

b. Adjustments in price by reason of this clause will be made at the end of each calendar month for the meals served during that month. The basis for determining the estimated number of meals to be served in a given month will be obtained by dividing total estimated number of meals for the entire contract period by the total number of days in that period and multiplying the results by the number of days in the month involved.

To deal with greater variations than those set forth above, Part IV further provided:

c. If the number of meals served in any calendar month (to other than contractor personnel) varies from the estimated requirements for that month by more than 30% of such requirements, the Contractor and the Contracting Officer will negotiate an equitable adjustment in the contract price for that month in the manner provided in the Changes Clause of this contract.

The Changes Clause in the contract provided that if any change caused an increase or decrease in the cost of performance, an equitable adjustment should be made in the contract price. Failure to agree to any adjustment would be a dispute concerning a question of fact within the meaning of the standard Disputes Clause.

In fact the Government's estimate was much too high, for in no one of the 11 months did the number of meals served even approach the estimate. In 7 of the 11 months the number of meals served was less than 70 percent for either Item 1 or Item 2, as shown by the following tabulation:

| Month | ITEM 1 | | | ITEM 2 | | |
|---|---|---|---|---|---|---|
| | Gov. est. | Actual | Percent | Gov. est. | Actual | Percent |
| (1968) | | | | | | |
| Nov | 115,890 | 87,026 | 75.09 | 10,685 | 7,492 | 70.12 |
| Dec | 119,753 | 77,256 | *64.50 | 11,041 | 6,926 | *62.73 |
| (1969) | | | | | | |
| Jan | 119,753 | 91,219 | 76.17 | 11,041 | 7,746 | 70.16 |
| Feb | 108,164 | 84,018 | 77.68 | 9,972 | 8,697 | 87.20 |
| Mar | 119,753 | 88,208 | 73.66 | 11,041 | 7,115 | *64.44 |
| Apr | 115,890 | 86,143 | 74.33 | 10,685 | 7,695 | 72.02 |
| May | 119,753 | 79,250 | *66.19 | 11,041 | 7,526 | *68.16 |
| Jun | 115,890 | 75,633 | *65.26 | 10,685 | 7,497 | 70.16 |
| Jul | 119,753 | 73,960 | *61.76 | 11,041 | 7,293 | *66.05 |
| Aug | 119,753 | 69,786 | *58.27 | 11,041 | 5,837 | *52.87 |
| Sep | 115,890 | 73,641 | *63.54 | 10,685 | 6,371 | *59.62 |
| Total | 1,290,247 | 886,140 | 68.73 | 118,958 | 80,195 | 67.50 |

*Less than 70 percent.

In January 1969, plaintiff requested the contracting officer to make the equitable adjustment required by reason of the fact that the December 1968 meals had fallen below 70 percent of the estimate. In February 1969, plaintiff informed the contracting officer that its own projections showed only 709,102 meals for Item 1 and 60,481 meals for Item 2 over the entire contract period, and it requested a revision of the contract prices to $.6629 and $.4875, respectively, instead of those stated in the contract, so that the contract price of $426,520.58 originally estimated for an aggregate of 1,409,205 meals would be paid for only 769,583 meals. No acceptable agreement could be arrived at, and, by change order to the contract, in May 1969 the contracting officer provided for payment to plaintiff for those months in which meals fell below the 70 percent level, as if 70 percent had been served and at the increased unit price provided therefor in the contract. It was agreed, however, that plaintiff's acceptance of

such payments would not prejudice its claim for additional payment.

■ In January 1970 after completion of the period, plaintiff submitted a claim for equitable adjustment for all of the 7 months in which one or the other of the items had fallen below 70 percent of the estimated meals. The claim was based on the plaintiff's costs for those 7 months plus 6 percent profit. This was rejected by the contracting officer for the reason that plaintiff's bids had been improvidently low so that even if all of the estimated meals had been served, plaintiff could not have made a profit.[1] The loss had also been added to by an unanticipated new labor contract increasing labor costs in May 1969. Since these were a part of plaintiff's and not the Government's risks, the adjustment could not be used as a device for converting the contract from a loss to a profit. In October 1970, the contracting officer issued his final decision which based the equitable adjustment on the amount the plaintiff would have received if 100 percent of the estimated meals had been served in the 7 months in which the number of either of the items was less than 70 percent, less an offset for the additional costs plaintiff would have had to incur. This resulted in payment for 286,088 additional meals which plaintiff never served.

As finally made, the Government's adjustment paid to the plaintiff was computed as follows:

| | |
|---|---|
| 7 months estimated meals at 100% | $235,056.24 |
| Less cost savings for curtailed services | −5,234.80 |
| | $229,821.44 |
| Less payment already made (including offset for lost equipment not in dispute) | −167,477.60 |
| Net adjustment | $62,343.84 |

It was stipulated that plaintiff received for the 7 months in question total payment of $225,507, including the above adjustment. Plaintiff's costs for those months, exclusive of legal fees, were $248,992.

The petition seeks an additional $38,-424.52, which it computes as follows (par. 10):

| | |
|---|---|
| Plaintiff's costs for the 7 months in dispute | $248,992.00 |
| Less amount received for the 7 months | −225,507.00 |
| Net difference | $23,485.00 |
| Plus 6% profit on $248,992.00 | 14,939.52 |
| | $38,424.52 |

Plaintiff claims the $38,424.52 for the 7 months under three different legal theories: first, as the appropriate equitable adjustment under the contract; second, as restitution after rescission of the contract, because the Government misrepresented the facts which induced it to enter into the contract; and, third, as damages for breach of contract, because the contracting officer's decision was not the result of his own exercise of judgment but a determination dictated to him by others. Plaintiff claims no other damages from the misrepresentation.

I

■ Plaintiff's claim under the contract for an equitable adjustment which would include all costs for meal service for the 7 months plus a 6 percent profit thereon cannot be sustained as a proper equitable adjustment under the contract. The differences between the parties relate to the proper construction and application of a contract clause and hence present a question of law with respect to which the decision of the Board is not final.[2] Nevertheless the Board appears to be correct.

The Variation from Estimate Clause provides no guidelines for the computation of the equitable adjustment therein. It merely states that if the 30 percent variation from requirements occurs the contractor and the contracting officer will negotiate an equitable adjustment in the contract price for that month "in the manner provided in the Changes Clause" of the contract. If this language is not an express adoption of the manner in which the "equitable adjustment"

---

1. The record shows that the contracting officer had twice requested plaintiff to review the computation of its bids because they were far below the prior years' unit prices.

2. Wunderlich Act, Ch. 199, § 2, 68 Stat. 81, 41 U.S.C. § 322 (1970).

is computed under the Changes Clause, the very absence of further description or definition calls for giving the same content to the term, since the purpose and context of the "equitable adjustment" in the Variation from Estimate Clause would appear to be not very different from that stated in the Changes Clause (to adjust the contract price for a "change [which] causes an increase or decrease in the cost of * * * performance"). Moreover, as this court had occasion to point out in General Builders Supply v. United States, 409 F.2d 246, 250-251, 187 Ct.Cl. 477, 484 (1969), in construing the same phrase in another new application:

> * * * [T]he meaning of "equitable adjustment" had become, so to speak, a "trade usage" for those engaged in contracting with the Federal Government. The knowledgeable federal contractor would understand it, and plaintiff, if it was not so knowledgeable, was charged with making itself aware of that usage. Cf. Uniform Commercial Code § 1-205. Since it was dealing with the Government, as to which a whole body of special contract provisions has developed, plaintiff could hardly take the naive stance that it had the right to read its contract as an unsophisticated layman might, without bothering to inquire into the established meaning and coverage of phrases and provisions which appear to be unusual or special to federal procurement.

And cf. also Dravo Corp. v. United States, 480 F.2d 1331, 202 Ct.Cl. ⸺ (1973).

■■ It is well established that the equitable adjustment may not properly be used as an occasion for reducing or increasing the contractor's profit or loss, or for converting a loss to a profit or vice versa, for reasons unrelated to a change. A contractor who has underestimated his bid or encountered unanticipated expense or inefficiencies may not properly use a change order as an excuse to reform the contract or to shift his own risks or losses to the Government. Nager Electric Co. v. United States, 442 F.2d 936, 945-946, 194 Ct.Cl. 835, 851-583 (1971); Keco Industries, Inc. v. United States, 364 F.2d 838, 849-850, 176 Ct.Cl. 983, 999-1002 (1966), cert. denied, 386 U.S. 958, 87 S.Ct. 1027, 18 L.Ed.2d 105 (1967); S. N. Nielsen Co. v. United States, 141 Ct.Cl. 793, 796-797 (1958). As the court stated in Bruce Construction Corp. v. United States, 324 F.2d 516, 518, 163 Ct.Cl. 97, 100 (1963), "Equitable adjustments are simply corrective measures utilized to keep a contractor whole when the Government modifies a contract."

■ Here the Board found it to be clear that plaintiff's contract was a loss contract and that plaintiff would have suffered a loss even if 100 percent of the Government's estimate had been served in the 7 months at issue. (Bd.Op., p. 7; on Reconsid., p. 2.) It found it unnecessary to decide whether or not the loss was attributable to an improvident bid or to the execution of an unforeseen labor contract which in May 1969 increased plaintiff's costs by 8 cents per man hour, since neither event created any right of reimbursement by the Government. The record fully supports the Board's finding. The amended contract price for serving 100 percent of the meals estimated therein was no more than $430,406.13. In a letter to the contracting officer dated January 21, 1970, plaintiff stated that, "[t]he contractor * * * incurred costs * * * in the total amount of $455,141.16" for serving what was in effect an average of 68 percent of estimated meals over the contract term. Thus, even if it would not have cost plaintiff one penny more to serve the 442,870 additional meals over the entire 11 months and if it had been paid the full estimated contract price, plaintiff would still have incurred a loss of $24,735.03. That plaintiff's costs were in excess of 100 percent of the contract price for the 7 months at issue has already been noted.

Under the circumstances the decisions of the contracting officer and the Board awarding to the plaintiff the full con-

tract price (less cost saving) for all of the meals estimated in each of the 7 months was quite generous. It obviated the necessity for plaintiff to prove the extent of its increased costs attributable to the shortfall. It gave plaintiff the benefit of any bargain it could fairly have contemplated for each of such months in entering into the contract, by paying plaintiff for an additional 286,088 meals which it had no occasion to serve during the 7 months.[3]

Plaintiff's claim under the contract for an equitable adjustment which would include all costs for meal service for the 7 months plus a reasonable (6 percent) profit is based on the decision in United States v. Pickett's Food Service, 360 F.2d 338 (5th Cir., 1966). That case involved an Air Force food service contract with substantially identical clauses. There the number of meals served fell below 70 percent of the estimate in eight out of the 12 months under the contract. The contracting officer granted the contractor an equitable adjustment based upon increasing the monthly compensation to that which would have been payable had 70 percent of the meals been served, which included a small increase in quantity and the 112 percent of unit price premium applicable to that percentage under the contract. The Board affirmed his decision on the ground that the contractor failed to show any increase in unit cost as a result of the shortfall. The court of appeals, differing with the Board, stated both that no increase in unit cost need be shown and that plaintiff "clearly showed an increase in unit cost as a result of the deviation from the 100% estimate," and then held that (360 F.2d at 343):

> The contractor is entitled to reasonable compensation for his services, which *in this case* we feel best can be reached by determining what the cost would have been for any prudent contractor similarly situated, plus a reasonable profit. (Emphasis ours [the court's].)

To the extent that the *Pickett's Food Service* decision stated that the reference to the Changes Clause in the Variation from Estimate Clause is only to the procedure for applying the equitable adjustment once determined and that the Changes Clause provides no guidance as to the method of computation of the adjustment, the decision is contrary to the views expressed herein. However, the court did not explain its reasoning. It did not consider whether or not the parties might have understood or intended the "equitable adjustment" concept in the light of its long history of judicial interpretation. In any event, the statement is at best only an alternative ground for decision.

More important, the *Pickett's Food Service* decision does not help the plaintiff with respect to resolution of the issue herein. First, the question there was as to the validity of an adjustment which gave plaintiff compensation increased only to the extent of the price for 70 percent of the amount estimated by the contract for each month, not 100 percent, as here. The decision does not reflect what the court would have done had the adjustment by the contracting agency given the contractor the full equivalent of its bargain for each month requested. Second, nothing in the *Pickett's Food Service* opinion indicates that the food service contract there at issue would have resulted in a loss to the contractor even if the quantity had coincided with the estimate; certainly the court did not discuss the question from that perspective at all. It cannot be assumed that the Fifth Circuit meant to differ with the rationale of such decisions of this court as S. N. Nielsen Co. and Bruce Construction Corp., *supra*, without even mentioning them. Third, as already indicated, the court found that *Pickett's* had proven the unit cost increases attributable to the shortfall in the months at issue, whereas here the Board found that plaintiff did not "show an increase in costs incurred as a result of the meal

---

**3.** Plaintiff's claim that it lost the opportunity for compensation for serving in excess of

100 percent of estimated meals is purely speculative.

count deviation." (Op. on Reconsid., p. 2.) Finally, the court made a point of stating that it did not "pass on the question of how an equitable adjustment can best be determined in other cases" (360 F.2d, *supra*, p. 343), but only that it was a responsible and workable one under the circumstances of the case before it.

■ Plaintiff also contends that it was improper for the Board to consider whether or not the contract was a loss contract, because the contracting officer was required to make the adjustments promptly from month-to-month before he could know the entire contract would involve a loss. Assuming the contract could be so construed, plaintiff is really asking for an "equitable" adjustment which would allow it a windfall. If each contemporaneous monthly adjustment gave plaintiff 100 percent of the contract price estimate for the month, it would still give plaintiff the economic equivalent of its bargain for that month and there would still be no equitable reason for giving it more. Moreover, even if the contracting officer had made contemporaneous monthly price adjustments, the cost of contract performance was not so complex as to preclude the making of monthly profit and loss analyses; and nothing prevented him from making the adjustments on a tentative basis pending completion of the contract. In fact, in considering plaintiff's first claim for an equitable adjustment for December 1968, on March 11, 1969, the contracting officer properly noted that "the information supplied by the contractor indicated that a loss would be experienced by the contractor even if the meals ordered were 100% of the estimated quantities."[4] (Op., p. 4.)

## II

.Plaintiff's claim for restitution is based on the theory that its bid was induced by factual misrepresentations as to the number of meals to be served, which were either fraudulent or so grossly negligent as to entitle plaintiff to rescind the contract. The Government represented that a fair estimate of the aggregate number of meals to be served over the 11-month contract term was 1,409,-205, a figure which was in excess of the number actually required during the period (966,335) by 46 percent. As a prima facie showing of the fraud or gross negligence it hopes to prove, it points to the facts that the actual number did not approach the estimate in any month under the contract, that in the majority of months the actual meals served were less than 70 percent of estimate, and further, that four of the sites for which 47,762 meals had been estimated, had ceased operations prior to the issuance of the solicitation and one site, for which 5,344 meals had been estimated, ceased operations after issuance of the solicitation but prior to the award of the contract. The closed sites, however, account for less than 4 percent of the estimate, and the record before the Board contains no explanation as to the reason for the large discrepancy.

Plaintiff seeks a trial de novo before this court on its rescission and restitution claim. In support of its motion for summary judgment, defendant asserts that the claim is based upon the same operative facts and seeks the same relief as the claim presented to the Board, that the Variation from Estimate Clause contemplates this situation and provides full relief in the form of an equitable

---

4. This information was obtained from plaintiff's correspondence with the contracting officer and by its contemporaneous profit and loss statements.

Plaintiff's profit and loss statement for the first two months reflected November 1968 operating expenses of $44,679.53 as against receipts of only $32,073.71 for serving 75.09 percent (Item 1) and 70.12 percent (Item 2) of the estimated meals. If compensation for the meals served were increased to 100 percent of estimate, plaintiff's receipts would still have been only $38,425.55 (115,980 x $.30785 plus 11,041 x $.246455). December expenses were $40,440.37 for serving only 64.5% (Item 1) and 62.73% (Item 2) of estimate. Payment for 100 percent of the estimated meals for that month (119,753 x $.30785 and 11,041 x $.246455) would have given plaintiff receipts of only $39,587.07.

price adjustment for wide variations from estimate. Therefore, defendant maintains, plaintiff is not entitled to a judicial retrial of a claim it agreed to present to the Board by redescribing it as a claim for a breach.[5]

■ The primary difficulty with defendant's argument is that if plaintiff's allegations are supportable the entire contract may be voidable, including the clauses with respect to Variations from Estimate, Changes and Disputes.[6] A party who has been induced to enter into a contract by a material misrepresentation of fact has the option of either ratifying or avoiding the contract at his election. If he ratifies it, he may properly insist upon the benefits of the bargain; if he rescinds, he is entitled to repudiate all of the contract provisions and to be restored to the status quo ante. Ringsby Truck Lines, Inc. v. Beardsley, 331 F.2d 14, 17 (8th Cir. 1964); Restatement of Contracts §§ 476, 484 (1932); Restatement of Restitution §§ 28, 68 (1937); 1 and 1A Corbin, Contracts §§ 146 at 636, 265 at 538 (1963); 12 Williston, Contracts § 1523 at 608 (1970).

■ It is not unfair to impute to the Government the representation that the figures set forth in the solicitation were bona fide estimates of the meals then being served or expected to be required during the contract term at the Air Force Base and the intent that bidders should rely upon them in shaping their bids. Even estimates must be made in good faith. (See Lipshitz & Cohen v. United States, 269 U.S. 90, 92, 46 S.Ct. 45, 70 L.Ed. 175 (1925); Krupp v. Federal Housing Adm., 285 F.2d 833, 835, n. 2 (1st Cir. 1961).) The provision for equitable price adjustments for variations from estimate may fairly have given notice to bidders that changes, even drastic ones up or down, might occur in the staffing of the Base, but it may hardly be deemed to have nullified the implied representation that the estimates were then made in good faith or with reasonable care on the basis of the facts then known to the Government.

Defendant's contention that the same operative facts were involved in the proceedings before the Board is not correct. The Board specifically held that the request for rescission of the contract invoked a power it did not possess and dismissed the claim for that reason (Op., p. 8). It was irrelevant to the issue before the Board whether the discrepancies between the estimates and the actual meals served were attributable to a falsification of the estimates to induce a lower bid or to later unanticipated changes. The Board merely concluded that: "The record does not disclose why all of the estimated number of meals was not required." (Op., p. 6.)

■ However, plaintiff's claim to rescission is vulnerable for another reason. The option to avoid a contract for fraud

5. Defendant cites in support of its argument principally: United States v. Utah Constr. Co., 384 U.S. 394, 418–420, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966); Dale Ingram, Inc. v. United States, 475 F.2d 1177, 201 Ct.Cl. 56 (1973); Teitelbaum v. United States, 458 F.2d 72, 87–88, 198 Ct.Cl. 150, 176–177 (1972); Hoel-Steffen Constr. Co. v. United States, 456 F.2d 760, 768, 197 Ct.Cl. 561, 574 (1972); Northbridge Electronics v. United States, 444 F.2d 1124, 1127, 195 Ct. Cl. 453, 458 (1971).

6. Cf. 6A Corbin, Contracts § 1444A at 465, with respect to the applicability of an arbitration provision in a contract induced by fraud:
"If the making of the principal contract, including the provision for arbitration itself, was induced by the fraud of one of the parties, the provision for arbitration will fall along with the principal contract if the aggrieved party exercises his power of avoidance; * * *."
But see Robert Lawrence Co. v. Devonshire Fabrics, Inc., 271 F.2d 402 (2nd Cir. 1959), cert. dismissed, 364 U.S. 801, 81 S.Ct. 27, 5 L.Ed.2d 37 (1960), where the arbitration clause was held separable and valid because it was not induced by the fraud. However, in the absence of express agreement it seems unreasonable to impute to a defrauded party the intent to be bound by the unilateral decision of the contracting officer of the defrauding party as to whether he has been guilty of fraud and the "equitable" adjustment therefor—irrespective of the availability of a board of contract appeals.

or misrepresentation is lost if after acquiring knowledge thereof the injured party continues with performance. He is deemed to have affirmed or ratified the voidable contract. Ling-Temco-Vought, Inc. v. United States, 475 F.2d 630, 201 Ct.Cl. 135 (1973); Restatement of Contracts § 484 (1932); Restatement of Restitution § 68 (1937); 12 Williston, Contracts, *supra* and § 1527; 1 and 1A Corbin, Contracts, *supra*. For then, absent special circumstances, plaintiff's continued losses in excess of those recoverable under or for breach of the contract are no longer due to the misrepresentation, and it deprives the Government of its right to avoid liability in excess of that set forth in the contract (*see* Ling-Temco-Vought, Inc. v. United States, *supra*).

 The findings of the Board relevant to the issue it did decide are sufficient to establish that plaintiff affirmed the contract and did not exercise or retain its option to avoid or repudiate it after it knew of the alleged misrepresentation.[7]

Plaintiff's election to make a claim under the Variations from Estimate and Changes Clauses and to pursue the matter before the Board was not an unambiguous ratification of the contract, since in the absence of a direct precedent charting the proper course of conduct in pursuance of a claim to restitution for misrepresentation of estimates in a situation such as this it could have subjected itself to the peril of having failed to exhaust its administrative remedies. However, plaintiff's other actions do represent more clearly the exercise of a choice to affirm the contract.

Having been able to serve only 75 percent (Item 1) and 70 percent (Item 2) of the estimated meals for November

and 64 percent and 63 percent, respectively, for December 1968, by the end of the second month plaintiff had more than an inkling that the estimates were way off. Nor can it reasonably claim that after 2 months it was still unaware that the five remote sites at which it was to provide service (accounting for about 4 percent of estimate) were closed and without personnel.[8] On February 27, 1969 plaintiff requested a revision of the contract prices for the reason that the Government's estimate of 1,409,205 meals for the contract term was erroneous, because on the basis of the actual facts for the prior year and the first 4 months under the contract (through January) it could project an aggregate of only 769,583 meals (Op., p. 4). Thus if the Government's misestimate of its requirements was a fraudulent or material misrepresentation which induced plaintiff to enter in the contract, plaintiff was sufficiently informed of it no later than February 1969. At that point it was in a position to elect to avoid the contract and to seek such restitution as would restore it to the status quo ante or to ratify the contract by continuing performance and relying upon the contract for redress. Having chosen the latter alternative, it is now too late for plaintiff to claim that the contract is still voidable for the original misrepresentation.[9]

 Plaintiff's petition in this court is also inconsistent with repudiation of the contract, because it seeks additional compensation only for the 7 months in which the number of meals served was below 70 percent of estimate and does not offer to relinquish such benefits as it may have obtained from the contract in the other months. *See* Svendborg v. United States, 130 F.Supp. 363, 367, 131

---

7. Such facts are entitled to finality in a new trial even "when the contractor sues for relief which the board was not empowered to give." United States v. Utah Constr. Co., *supra*, 384 U.S. at 420, 86 S.Ct. at 1559.

8. Plaintiff's administrative controller testified he knew of it in February 1969.

9. The agreement in May 1969, that plaintiff's acceptance of payments for 70 percent of estimate where the level of service fell below it, pursuant to Contract Change Order No. 1, would not prejudice its claim for additional payment obviously referred to additional payment under the contract, of which it had been continuing performance.

Ct.Cl. 399, 406–407 (1955) petition for cert. dismissed, 350 U.S. 978, 76 S.Ct. 455, 100 L.Ed. 848 (1956); 5 Corbin, Contracts § 1114 at 607, 608, 618. Finally plaintiff's claim to a profit on its performance for the 7 months is inconsistent with a choice of rescission and restitution. Restitution would entitle plaintiff merely to be restored to the status quo ante, pursuant to which it would be limited to its prudent costs, without the profit it anticipated under the contract. Acme Process Equipment Co. v. United States, 347 F.2d 509, 530–531, n. 29, 171 Ct.Cl. 324, 360 n. 29 (1965), rev'd on other grounds, 385 U.S. 138, 87 S.Ct. 350, 17 L.Ed.2d 249 (1966).

## III

Plaintiff's final claim is that there was a breach of contract by defendant because the contracting officer's decision with respect to the equitable adjustment was not the product of his personal and independent judgment, but was dictated to him by others. The Board found that the evidence did not establish "that the contracting officer failed to put his own mind to the adjustment problem and render his own decision." (Op. p. 9; on reconsid., p. 3.) Defendant relies for summary judgment on the findings and record of the Board, while plaintiff, in opposition, contends that since such conduct constitutes a breach summary judgment on the basis of the Board findings and record is improper.

The Variation from Estimate Clause provided that the "contractor and the contracting officer will negotiate an equitable adjustment in the contract price" and the Disputes Clause provided that "any dispute concerning a question of fact arising under this contract * * * shall be decided by the Contracting Officer, * * *."

It is apparent the placing of responsibility on the contracting officer for determining the adjustment conferred considerable discretion on him. There were no guidelines on the fixing of the unit price. He had to determine, whether or not, in view of the Government's misestimate, the amount should include payment for more meals than were in fact served, and the extent thereof. He had to consider the economic effect of the shortfall on the contractor's costs. He could consider the Government's culpability in the misestimate and the extent of the contractor's reliance thereon. If the increased payment was for actual meals not served, he could consider the fairness of an offest for the contractor's cost savings.

In view of the foregoing and also the fact that the contract provided an opportunity for negotiation and agreement with the contracting officer, which would necessarily entail the submission to him of factual presentations and equitable arguments, in entering into the contract it is fair to impute to the parties the intent that the determination be made by the contracting officer in the exercise of his own discretion. New York Shipbuilding Corp. v. United States, 385 F.2d 427, 435, 180 Ct.Cl. 446, 460 (1967); and see also Schlesinger v. United States, 390 F.2d 702, 707–709, 182 Ct.Cl. 571, 581–584 (1968). On the other hand, it is unreasonable to construe the requirement for decision by the contracting officer to preclude the obtaining of legal advice, and particularly where the contracting officer is not a lawyer. Even if an overly liberal grant by a contracting officer would not be reviewable on the Government's appeal, it would have to be assumed that the contracting officer like any other officer of the United States would do his best to follow the requirements of law. It was contemplated that after receiving recommendations, legal opinions and advice, "in the end he put his own mind to the problems and render his own decisions." New York Shipbuilding Co. v. United States, supra, 385 F.2d at 435, 180 Ct.Cl. 460. But there was no implied prohibition against his first obtaining or even agreeing with the views of others. J. A. Terteling & Sons, Inc. v. United States, 182 Ct.Cl. 691, 694, 390 F.3d 926, 927 (1968); Jacob Schlesinger, Inc. v. United States, 94 Ct.Cl. 289, 307 (1941).

Plaintiff advances no reason why the Board's findings on this issue should not be treated as findings "concerning a question of fact" which both the Disputes Clause and the Wunderlich Act provide shall be final and conclusive if supported by substantial evidence. That plaintiff claims a breach of contract does not make the findings any the less dispositive. United States v. Utah Constr. Co., *supra*, 384 U.S. at 419, 86 S.Ct. 1545. In Schlesinger v. United States, *supra*, the court assumed, without necessity for discussion that such question could properly be reviewed solely on the administrative record.

The Board found here:

\* \* \* \* \* \*

\* \* \* [T]he testimony of the contracting officer, largely in response to leading questions by appellant's counsel, upon which appellant relies, falls short, we think of an admission that the final decision was not his own. The matter he discussed with the Government attorneys did not relate to a question of fact nor a matter involving his independent "business" discretion and judgment, \* \* but, rather, the interpretation of a court decision. The contracting officer's unled testimony referred to the attorneys' comments as "legal advice." He was entitled to the benefit of that advice, to consider it and to accept it. That acceptance did not mean that the contracting officer failed to put his own mind to the problem and render his own decision. \* \* \* The appellant has not proved more than that the discussion with his lawyers caused the contracting officer to accept legal advice that the *Pickett's* decision, *supra*, did not compel an equitable adjustment based on this contractor's costs, thus allowing him to exercise his judgment and return to his previous position as to a proper adjustment. \* \* \* [Op. pp. 8–9.]

In the portion of the record upon which plaintiff relies for the abdication of discretion argument the contracting officer, who was not a lawyer, testified that on the basis of his reading United States v. Pickett's Food Service, *supra*, he had initially made an offer to settle the plaintiff's claim for plaintiff's cost plus a reasonable profit. The testimony continued:

Q [Plaintiff's Counsel] What happened between September 28th and October 7th to cause you to withdraw the offer?

A [Contracting Officer] I had legal advice that my offer was incorrect and I should withdraw it—resubmit it.

Q When you say that you should withdraw it and resubmit—

A Make a final determination.

Q Who gave you that advice?

A Mr. Adams, Colonel Bohdan Danyliw.

Q Do you recall what they said to you to cause you to change your position?

A Not verbatim, I can't. The upshot of it was, that they thought a fair settlement was 100 percent of the contract price.

Q They thought a fair settlement was 100 percent?

A Yes.

Q And you went along with that?

A That's right.

Q Did they give you any written instructions with respect to the question?

A I don't recall. I don't believe they did.

Q Was this the result of a telephone conversation?

A Yes, it was.

Q Which they hold you to "alter your position and withdraw the $93,-000 offer", is that correct?

A Yes, sir.

[Plaintiff's counsel] I have no further questions.

 Plainly this testimony is not enough to prove that the contracting of-

ficer's final decision on matters with respect to which it was expected he would exercise his discretion was not his own. It is doubtful that the testimony even *tends* to support plaintiff's contention. The witness first testified that he regarded the communication as legal "advice." Subsequently counsel asked the witness whether it was by a telephone conversation rather than written instruction. It is not clear whether the witness' affirmative response interrupted the question before it was completed, because counsel apparently continued, "[in] [w]hich they told you to alter your position and withdraw the prior offer, is that correct?" Counsel argues in effect that the witness' affirmation at this point indicates his agreement that he accepted a peremptory direction or order. But it is at least equally probable that he was merely reiterating the prior response which he had given before the question was completed, that the communication was in a telephone conversation rather than in writing. Moreover, "told" is a word having different shades of qualitative meaning, including the wholly neutral one of "said." Plaintiff's counsel may have intended it in the sense of "ordered" or "instructed" but he gave no warning to the witness that he was now changing the subject and drawing a different distinction than whether the communication was oral or in writing, but between legal advice and an order or direction. Elemental fairness requires a more explicit notice to the witness before he may be deemed to have repudiated his prior testimony.

McCormick, Evidence (§ 7, 2nd ed., 1972) states the following with respect to the probative force of leading questions which contain assumptions:

> * * * A still more common vice is for the examiner to couch the question so that it assumes as true matters to which the witness has not testified and which are in dispute between the parties. The danger here is twofold. First, if the examiner is putting the question to a friendly witness, the recitation of the assumed fact may suggest the desired answer; and second, whether the witness is friendly or hostile, the answer is likely to be misleading. Oftentimes, the question will be so separate from the assumption that if the witness answers the question without mentioning the assumption, it is impossible to ascertain whether he ignored the assumption or affirmed it.

In Tombigbee Constructors v. United States, 420 F.2d 1037, 1048, 190 Ct.Cl. 615, 634–635 (1970), the court discussed a similar situation. There the question was whether the contractor had agreed that certain extra work should be done without cost. In questioning the Government's engineer, Government counsel asked whether during certain negotiations the contractor had "again" agreed to bear responsibility for the work in question. The witness responded, "That is correct." (420 F.2d at 1048, 190 Ct.Cl. at 634–635.) The court, on reviewing the administrative record, found that there was no evidence in that record regarding a prior agreement by the plaintiff to pay these costs and that therefore the response to Government counsel's questions was of little probative value:

> * * * A question which assumes a fact not conceded or not yet in evidence is not only leading, it is misleading as well. * * * Answers to questions so egregiously leading are more than improper and objectionable; *they are not probative. The Board should not have credited, and apparently did not credit the testimony as evidence of an agreement* to do the work without pay. * * * [Emphasis supplied.] [420 F.2d at 1048, 190 Ct.Cl. at 635.]

The presiding Board member who heard and observed the evidence was in the best position to determine the witness' credibility. The Board's conclusion was that greater weight should be

given to the witness' earlier unled testimony than to the part on which plaintiff relies. It is not the function of this court in a Wunderlich Act review to weigh the evidence independently, but merely to examine it to see if there is substantial evidence to sustain the administrative findings. Chaney & James Constr. Co. v. United States, 421 F.2d 728, 738, 742, 190 Ct.Cl. 699, 717, 724 (1970). The Board's findings on this issue are supported by substantial evidence.

## CONCLUSION

Plaintiff's motion for summary judgment is denied. Defendant's cross-motion for summary judgment is granted and plaintiff's petition is dismissed.