CEMS, INC., Plaintiff,

v.

UNITED STATES, Defendant.

Nos. 99–951C, 00–437C to 00–439C.

United States Court of Federal Claims.

April 22, 2005.

Richard E. Alexander, Stoel Rives, LLP, Portland, Oregon, for the plaintiff.

Michael D. Austin and William Kanellis, Trial Attorneys, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for the defendant, and Timothy Binder, Department of Transportation, Washington, D.C., of counsel.

## OPINION

HORN, Judge.

This matter comes before the court on the application of CEMS, Inc. for attorney fees under the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412 (2000). Plaintiff alleges that it is entitled to an award of attorney fees and expenses under EAJA. More specifically, plaintiff argues that (1) the contracting officer assigned to this case at the Department of Transportation Federal Highway Administration (FHA), Western Federal Lands Highway Division "surrendered his or her authority to make decisions" during the administration of the contract; (2) that the contracting officer also "surrendered to others adjudication of claims submitted by CEMS;" and (3) that the government was not substantially justified in proceeding to trial on those claims on which CEMS ultimately prevailed. Plaintiff also alleges that the government should have recognized the "core failings of [the agency contracting officer] to administer the project or determine the claims...[and] should have earlier and more actively sought a global solution, but instead it compelled CEMS to adjudicate its claims at a cost that was overwhelming." Plaintiff seeks $221,701.56 in EAJA attorney fees. After careful consideration of the record before the court and the applicable law, the court finds that the defendant is liable to the plaintiff for $57,058.64 in EAJA fees.

## FINDINGS OF FACT

The facts of this case were fully detailed in this court's lengthy November 3, 2003 opinion, *CEMS, Inc. v. United States,* 59 Fed.Cl. 168 (2003), and those facts are incorporated into this opinion. Only a brief recitation of the most pertinent facts to the present motion will be repeated here. On April 6, 1998, the FHA awarded a $1,676,154.00 contract to CEMS for the construction of a bicycle path on a 3.888 kilometer portion of the Historic Columbia River Highway, between the Columbia Fish Hatchery and the "Bridge of the Gods."

As a result of disputes which arose during performance of the contract, plaintiff filed multiple claims with the contracting officer. The plaintiff then filed several separate appeals before the Department of Transportation Board of Contract Appeals (DOTBCA). During the pendency of the plaintiff's appeals before the DOTBCA, the plaintiff submitted another, comprehensive claim to the agency contracting officer, including numerous separate claims, some of which included separate pay items for changes, delays, and other allegations of acts or omissions by FHA, for which plaintiff requested an equitable adjustment under the terms of the contract. Following the denial of a number of plaintiff's claims and separate bid items by the contracting officer, CEMS filed its complaint in this court. The plaintiff subsequently filed a motion to consolidate the DOTBCA appeals with this case, which the court granted.

On June 27, 2000, pursuant to a government motion to dismiss, this court dismissed a number of the claims filed with this court. On the first day of trial, the parties settled a number of additional claims and separate bid items. A large number of claims and individ-

ual bid items remained for trial. During the trial, CEMS added 3 supplemental claims, bringing the total damages sought to $1,241,203.70. Following the trial, this court found government liability on 6 of the remaining 19 claims and 3 of the remaining 11 bid items, resulting in a judgment for the plaintiff in the amount of $316,567.52. Defendant then filed a motion for partial reconsideration of this court's opinion, seeking review of 3 of the claims included in the court's opinion. The court granted reconsideration regarding 2 of the bid items and claims in favor of the government and revised plaintiff's recovery from $316,562.52 to $294,777.89.

Plaintiff's EAJA application was filed in this court seeking attorney fees and expenses for work performed. Plaintiff's itemized statement indicates that it seeks fees and other expenses incurred from June 8, 1999 to July 20, 2004.

## DISCUSSION

### I. EAJA Requirements

The EAJA provides that a judgment for costs "may be awarded to the prevailing party in any civil action brought by or against the United States...." 28 U.S.C. § 2412(a)(1). Section 2412(d)(1)(B) of the EAJA provides:

A party seeking an award of fees and other expenses shall, within thirty days of final judgment in the action, submit to the court an application for fees and other expenses which shows that the party is a prevailing party and is eligible to receive an award under this subsection, and the amount sought, including an itemized statement from any attorney or expert witness representing or appearing on behalf of the party stating the actual time expended and the rate at which fees and other expenses were computed. The party shall also allege that the position of the United States was not substantially justified.

28 U.S.C. § 2412(d)(1)(B). "The purpose of the EAJA is to 'eliminate legal expenses as a barrier to challenges of unreasonable government action.'" *Cmty. Heating & Plumbing Co. v. Garrett*, 2 F.3d 1143, 1145 (Fed.Cir.

1993) (citations omitted). Because EAJA constitutes a "partial waiver of sovereign immunity," the statute is to be "strictly construed in favor of the United States," *Ardestani v. I.N.S.*, 502 U.S. 129, 137, 112 S.Ct. 515, 116 L.Ed.2d 496 (1991) and, therefore, cannot be "enlarged beyond what the language requires." *United States v. Nordic Vill.*, 503 U.S. 30, 34, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992).

Thus, eligibility for an award of attorney fees and expenses in a civil action requires (1) that the claimant be a prevailing party; (2) that the government's position viewed over the entire course of the dispute was not substantially justified; (3) that no special circumstances make an award unjust; and (4) that pursuant to section 2412(d)(1)(B), any fee application be submitted to the court within thirty days of final judgment in the action and be supported by an itemized statement. *See* 28 U.S.C. § 2412(d)(1)(A),(B); *Comm'r, I.N.S. v. Jean*, 496 U.S. 154, 158, 110 S.Ct. 2316, 110 L.Ed.2d 134 (1990).

### II. Entitlement

Defendant concedes that plaintiff was the prevailing party in this action and is otherwise EAJA-eligible. However, because EAJA "was not intended to be an automatic fee-shifting device" in any given lawsuit where the applicant prevails against the government, the government may successfully assert a substantial justification defense to prevent recovery under EAJA. *See Luciano Pisoni Fabbrica Accessori Instrumenti Musicali v. United States*, 837 F.2d 465, 467 (Fed.Cir.), *cert. denied* 488 U.S. 819, 109 S.Ct. 60, 102 L.Ed.2d 38 (1988) (quoting *Gavette v. Office of Personnel Mgmt.*, 808 F.2d 1456 (Fed.Cir.1986)); *see also California Marine Cleaning, Inc. v. United States*, 43 Fed.Cl. 724, 729 (1999). The United States Supreme Court has held that "substantially justified" does not mean "'justified to a high degree,' but rather 'justified in substance or in the main'—that is, justified to a degree that could satisfy a reasonable person." *Pierce v. Underwood*, 487 U.S. 552, 565, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988) (citations omitted); *see also Larsen v. United States*, 39 Fed.Cl. 162, 167 (1997), *appeal dismissed,*

152 F.3d 945 (Fed.Cir.1998). It is no different from the "reasonable basis in both law and fact" formulation used by the majority of United States Courts of Appeal. *Pierce v. Underwood,* 487 U.S. at 565, 108 S.Ct. 2541. Substantially justified, however, means "more than merely undeserving of sanctions for frivolousness." *Id.* at 566, 108 S.Ct. 2541.

While the Supreme Court has cautioned that an evaluation of an EAJA application should not evolve into a "second major litigation," *Hensley v. Eckerhart,* 461 U.S. 424, 436, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), this court is nevertheless bound by Congress' inclusion of a separate legal standard of substantial justification to conduct an independent evaluation of the government's position "through the EAJA 'prism.'" *Luciano Pisoni Fabbrica Instrumenti Musicali v. United States,* 837 F.2d at 467 (citing *F.E.C. v. Rose,* 806 F.2d 1081, 1090 (D.C.Cir.1986)). The court must review the position of the government, on a case by case basis, looking to the record to determine whether or not the government's position (both at the agency level and during the litigation) was substantially justified. *See Gavette v. Office of Personnel Mgmt.,* 808 F.2d at 1467. "The decision on an award of attorney fees is a judgment independent of the results on the merits and is reached by examination of the government's position and conduct through the EAJA 'prism'...." *Luciano Pisoni Fabbrica Musicali v. United States,* 837 F.2d at 467.

In 1985, the EAJA statute defining "position of the United States" was amended to include "the action or failure to act by the agency upon which the civil action is based...." *Comm'r, I.N.S. v. Jean,* 496 U.S. at 160, 110 S.Ct. 2316. Prior to that time, the United States Court of Appeals for the Federal Circuit had interpreted "position of the United States" to be limited to the position the government took during litigation. *See Chiu v. United States,* 948 F.2d 711, 715 (Fed.Cir.1991) (citations omitted).

During the course of a civil action, the government may take a number of positions, including positions on the merits, positions on pre-trial, trial and post-trial matters, and on appeal. Prior to 1990 many Circuit Courts of Appeal, including the United States Court of Appeals for the Federal Circuit, allowed cases to be segmented during the substantial justification determination in order to award fees for a significant portion of the litigation in which the government's position was not substantially justified. *See Ellis v. United States,* 711 F.2d 1571, 1576 (Fed.Cir.1983); *see also Smith v. Bowen,* 867 F.2d 731, 735 (2d Cir.1989) (citations omitted); *Matthews v. United States,* 713 F.2d 677, 684 (11th Cir.1983); *Goldhaber v. Foley,* 698 F.2d 193, 196–97 (3d Cir.1983).

Subsequent to the Federal Circuit's decision in *Ellis,* the United States Supreme Court decided *Commissioner, I.N.S. v. Jean,* 496 U.S. 154, 110 S.Ct. 2316, 110 L.Ed.2d 134 (1990). In *Jean,* the District Court had awarded EAJA fees to plaintiffs as prevailing parties, including fees for the EAJA application. *Id.* at 156, 110 S.Ct. 2316. The Court of Appeals found that the District Court's decision finding lack of substantial justification on the part of the government in the underlying litigation was within the trial court's discretion, but remanded the case for recalculation of attorney fees and expenses. *Jean v. Nelson,* 863 F.2d 759, 778 (1988). On *certiorari,* the United States Supreme Court defined substantial justification as "justified in substance or in the main—that is, justified to a degree that could satisfy a reasonable person." *Comm'r, I.N.S. v. Jean,* 496 U.S. at 158 n. 6, 110 S.Ct. 2316 (quoting *Pierce v. Underwood,* 487 U.S. at 565, 108 S.Ct. 2541). The *Jean* Court went on to point out that "[s]ubsection (d)(1)(A) [and the 1985 EAJA amendment] refers to an award of fees 'in any civil action' without any reference to separate parts of the litigation, such as discovery requests, fees or appeals." *Comm'r, I.N.S. v. Jean,* 496 U.S. at 159, 110 S.Ct. 2316. The reference to "'the position of the United States' in the singular also suggests that the court need make only one finding about the justification of that position." *Id.* at 159, 110 S.Ct. 2316. According to the Supreme Court: "The single finding that the government's position lacks substantial justification, like the determination that a claimant is a 'prevailing party,' thus operates as a one-time threshold for the eligibility." *Id.* at 160, 110 S.Ct. 2316. "[I]t remains for the

[trial] court to determine what fee is reasonable," *id.* at 161, 110 S.Ct. 2316, and it is "appropriate to allow the [trial court] discretion to determine the amount of a fee award." *Id.* According to the Supreme Court, in an often quoted turn of phrase: "[w]hile the parties' postures on individual matters may be more or less justified, the EAJA—like other fee-shifting statutes—favors treating a case as an inclusive whole, rather than as atomized line-items." *Id.* at 161–62, 110 S.Ct. 2316 (citations omitted). Thus, in *Jean,* the Supreme Court concluded that EAJA is intended "to cover the cost of all phases of successful civil litigation addressed by the statute," *id.* at 166, 110 S.Ct. 2316, including fee litigation. *Id.* at 157, 110 S.Ct. 2316; *see also California Marine Cleaning, Inc. v. United States,* 43 Fed.Cl. at 729 ("Only one determination of substantial justification can be made, which may encompass both the agency's pre-litigation conduct and the Department of Justice's subsequent litigation position.").

Following the Supreme Court's ruling in *Jean,* the United States Court of Appeals for the Federal Circuit directed trial courts to "look at the entirety of the government's conduct and make a judgment call whether the government's overall position had a reasonable basis in both law and fact," including "the entirety of the conduct of the government... including action or inaction by the agency...." *Chiu v. United States,* 948 F.2d at 715; *see also Gargoyles, Inc. v. United States,* 45 Fed.Cl. 139, 146–47 (1999), *appeal dismissed,* 232 F.3d 910 (Fed.Cir.2000) (citations omitted). The Federal Circuit further noted that this exercise is primarily discretionary in nature and that it is for the trial court to "weigh each position taken and conclude which way the scale tips ...." *Chiu v. United States,* 948 F.2d at 715 n. 4. Neither *Jean* nor *Chiu,* however, explicitly resolve or

address whether the totality of the circumstances approach allows a trial court to conclude that the government's overall conduct or position was substantially unjustified when the government was substantially justified in opposing most, but not all, of numerous claims filed by the plaintiff, as in the present case.

Several courts have found that the language in *Jean* does not require every argument made by the government to be substantially justified. *See Marcus v. Shalala,* 17 F.3d 1033, 1036 (7th Cir.1994) (holding that the trial court should only make one determination regarding substantial justification for the entire civil action) (citing *Comm'r, I.N.S. v. Jean,* 496 U.S. at 159, 110 S.Ct. 2316); *Hanover Potato Prods., Inc. v. Shalala,* 989 F.2d 123, 131 (3d Cir.1993) (declining to hold that the government must be substantially justified in every position it takes). In *Roanoke River Basin Association v. Hudson,* the United States Court of Appeals for the Fourth Circuit found that courts should look at the entire litigation and that *Commissioner, I.N.S. v. Jean,* 496 U.S. at 161–62, 110 S.Ct. 2316, "discourages an issue-by-issue analysis of the government's posture throughout each phase of the litigation."[1] *Roanoke River Basin Ass'n v. Hudson,* 991 F.2d 132, 138–39 (4th Cir.), *cert. denied,* 510 U.S. 864, 114 S.Ct. 182, 126 L.Ed.2d 141 (1993). However, the court also wrote that when determining whether the government was substantially justified, the court should "consider the reasonable overall objectives of the government and the extent to which the alleged governmental misconduct departed from them." *Id.* The inquiry requires the trial court to evaluate "every significant argument made by an agency" to determine if it is substantially justified, and then conclude "whether, as a whole, the Government's position was substantially justified." *Hanover*

---

1. In *Roanoke River Basin Association,* the court also concluded that although *Jean* does not direct that the court look "only at the government's macrocosmic position," it plainly does direct "a more broadly focused analysis that would reject the view that any unreasonable position taken by the government in the course of litigation automatically opens the door to an EAJA award." *Roanoke River Basin Ass'n v. Hudson,* 991 F.2d at 139. The court, therefore, concluded that

particularly egregious government misconduct on a narrow but important issue could taint the government's entire position, making its defense of the case unreasonable. *Id.* Conversely, the court in *Roanoke River Basin Association* found that an unfounded and unreasonable position on an inconsequential aspect of the litigation may not undermine the government's entire position because of its relatively small impact on the entire civil action. *Id.*

*Potato Prods., Inc. v. Shalala,* 989 F.2d at 131.

The United States Court of Appeals for the Eleventh Circuit, in contrast, held in *United States v. Jones,* that the United States cannot escape responsibility for paying EAJA fees unless all its claims were substantially justified. The Eleventh Circuit affirmed the District Court's conclusion that: "[t]he United States may be required to pay EAJA fees to a prevailing party for the work on any claim that was not substantially justified." *United States v. Jones,* 125 F.3d 1418, 1427 (11th Cir.1997) (citing *Hensley v. Eckerhart,* 461 U.S. at 440, 103 S.Ct. 1933). The *Jones* court specifically rejected the government's contention that the decision in *Jean* overruled the *Hensley* opinion. *Id.* at 1427–28.

An Alabama District Court followed *Jones,* stating that *Jones* "stand[s] for the proposition that, in order for the defendants' overall position to be substantially justified, their opposition to each of the plaintiffs' claims must have been substantially justified." *Nat'l Fed'n. of Republican Assemblies v. United States,* 263 F.Supp.2d 1372, 1380 (S.D.Al.2003). The Alabama District Court ultimately concluded that when a plaintiff asserts several related claims and the government is not justified in defending against one of those claims, its " 'overall position' is not substantially justified because the plaintiff is entitled to relief if even one of its claims is valid." *Id.*

■ In the case currently before the court, in which the plaintiff presented over one hundred claims stemming from the same factual core, requiring the government to be substantially justified in every single defense would lead to endless litigation over fees. *See Comm'r, I.N.S. v. Jean,* 496 U.S. at 162–63, 110 S.Ct. 2316. Determinations based on the degree of success obtained by the petitioner may be considered as a factor in determining whether the petitioner was the prevailing party and whether the amount of EAJA fees awarded is reasonable. When determining whether the government's overall position is substantially justified, however, the court should examine not only the government's success or failure, but also the reasonableness of its position in defending against the suit. *See Roanoke River Basin Ass'n v. Hudson,* 991 F.2d at 139. While Congress enacted the EAJA to eliminate the financial disincentive to challenge unreasonable government actions, it was not "intended to chill the government's right to litigate or to subject the public fisc to added risk of loss when the government chooses to litigate reasonably substantiated positions.…" *Id.* Moreover, the United States Court of Appeals for the Federal Circuit cited favorably to the EAJA House Report, to the effect that "substantial justification is to be decided case-by-case on the basis of the record." *Gavette v. Office of Personnel Mgmt.,* 808 F.2d at 1467 (citing H.R.Rep. No. 120 at 10, 13, *reprinted in* 1985 U.S.C.C.A.N. at 138, 141–42).

■ This court, therefore, approaches the plaintiff's entitlement to EAJA fees by reviewing the government's overall position, without requiring that each and every government position be substantially justified. For a defendant to prevail when a case involves numerous claims that are factually and legally intertwined, the "position of the United States" should be viewed based on the totality of the circumstances of the entire claim, including balancing the government's various positions against their impact on the entire civil litigation.[2] This court, therefore, will evaluate the government's significant arguments at various stages of this litigation in order to make a determination as to whether the defendant's overall position was substantially justified. *See Filtration Dev. Co. v. United States,* No. 03–2835C, 2005 U.S. Claims LEXIS 42, at *20–21 (Fed.Cl. Jan. 14, 2005) ("[W]hile the court undertakes its task of examining the government's position

---

**2.** This court notes that at least one court has found, based on the language in *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40, that separate claims that are sufficiently distinct will have its own merit determination, therefore dictating a "claim by claim" analysis.

*S.E.C. v. Morelli,* No. 91–3874, 1995 WL 9387, at *7, 1995 U.S. Dist. LEXIS 141, at *25–26 (S.D.N.Y. Jan. 11, 1995). The claims in the case before this court, however, arise from the same nucleus of facts and concern intertwined legal theories. *See id.*

aware that it must reach a single conclusion, the court believes that an analysis of the positions the government took in response to plaintiff's allegations is pertinent to court's final determination.") (citing *KMS Fusion, Inc. v. United States*, 39 Fed.Cl. 593 (1997)).

## A. Contract Administration

First, plaintiff argues that the agency behavior which gave rise to the underlying contract claims was the result of arbitrary and capricious behavior by the contracting officer as a result of his "surrendering to others administration of the contract." In support of this allegation, the plaintiff cites to this court's previous finding in the trial opinion that the contracting officer "delegated broad discretion in supervising this contract, which project engineer Chew exercised daily." *CEMS, Inc. v. United States*, 59 Fed.Cl. at 203. This court's examination of the authority exercised by the contracting officer's technical representative (COTR) was undertaken primarily for the purpose of determining whether the project engineer possessed authority to direct the project. *Id.* This court did not previously find, nor does the record reflect, that the agency or the contracting officer acted unreasonably in allowing the project engineer to play a leading role in the field during administration of the contract. In the trial opinion, the project engineer, although not infallible, was found to have acted properly in the main and any liability based on his actions has already been addressed and remedied. This court did not, and once again does not, find that the traditional use of a contracting officer's technical representative in the administration of large contracts, with many separate tasks, necessarily constitutes an abdication of responsibilities. Moreover, the record does not support the type of inappropriate behavior to support an award of EAJA fees regarding the government's actions during contract management.

## B. Contracting Officer's Final Decision

■ CEMS further contends that the government's position at the administrative level was not substantially justified because the contracting officer "surrendered to others adjudication of claims submitted by CEMS," and that their subordinates abused that authority. The plaintiff also alleges that the contracting officer "denied claims in which even government error or changes were acknowledged." To support its claim that the contracting officer acted unreasonably, CEMS first notes that the contracting officer hired a former contracting officer, Frank Baldwin, to assist in evaluating the plaintiff's claims, and that the contracting officer relied entirely on his analysis. The plaintiff points out that at trial "[i]ncredibly, Baldwin was not even called by FHA to testify."

Although a contracting officer may obtain the advice of others, the contracting officer still must "put his own mind to the problems and render his own decisions...." *Pacific Architects & Eng'rs, Inc. v. United States*, 203 Ct.Cl. 499, 518, 491 F.2d 734, 744 (1974) (quoting *New York Shipbuilding Corp. v. United States*, 180 Ct.Cl. 446, 460, 385 F.2d 427 (1967)). However, there is "no implied prohibition against [the contracting officer] first obtaining or even agreeing with the views of others." *Pacific Architects & Eng'rs, Inc. v. United States*, 203 Ct.Cl. at 517–18, 491 F.2d at 744 (citing *J.A. Terteling & Sons, Inc. v. United States*, 182 Ct.Cl. 691, 694, 390 F.2d 926 (1968) and *Jacob Schlesinger, Inc. v. United States*, 94 Ct.Cl. 289, 307, 1941 WL 4589 (1941)). Clearly, the contracting officer in this case was justified in seeking the assistance of a former contracting officer, or other qualified advisors, given the extensive and detailed nature of the claims. However, a review of the record in the case before this court indicates that in doing so, the CEMS contracting officer failed to "put his own mind to the problems," and to take ownership of all determinations included in the final contracting officer's opinion. *Pacific Architects & Eng'rs, Inc. v. United States*, 203 Ct.Cl. at 518, 491 F.2d at 744.

The contracting officer's testimony during trial indicates a pattern of releasing authority to subordinates and remaining remarkably detached from the decision-making process. The contracting officer appeared to have relied almost exclusively on Mr. Baldwin's determinations and, although he testified that

he reviewed an early draft of the "contracting officer's final decision," he admitted to not being an integral part of the process as he should have been. The contracting officer testified regarding his review and evaluation of CEMS' claims as follows:

Q. [Plaintiff's attorney] All right. Did you review in detail the backup data or the purported backup data for the Final Contractor's [sic] Officer's Decision, or is that something you relied on Mr. Baldwin to do?

A. [Contracting officer] There was a great amount of reliance on Mr. Baldwin.

Q. All right. Do you think you looked at any of the stuff?

A. I looked at it early on, rather cursorily.

Q. All right.

A. But taken [sic] how much volume there was and what basically there was during the claim analysis, I relied on Mr. Baldwin.

The contracting officer further testified that he did not know whether Mr. Baldwin had conducted a critical path analysis, or had interviewed pertinent witnesses in the course of preparing the contracting officer's final decision. In addition, he was unaware that CEMS had submitted substantial, notarized bid information, thereby discrediting Mr. Baldwin's rejection, in the draft contracting officer's final decision, of a claim on the ground that CEMS had not provided its bid information. Moreover, it is apparent from the contracting officer's testimony that he and his subordinates relied almost entirely on government sources in making determinations for the COFD, and gave little, if any, consideration to evidence submitted by CEMS. *See Marshall Associated Contractors, Inc. & Columbia Excavating, Inc.*, 2001–1 B.C.A. (CCH) ¶ 31,248, at 154,259, 2001 WL 59573 (I.B.C.A.2001) (finding that the contracting officer abused his discretion by relying entirely upon the advice of his technical personnel). For example, the contracting officer admitted that when inquiring into unclear records concerning Claim C4, Mr. Baldwin only interviewed the government's project engineer and did not approach CEMS for clarification. When asked whether, as a matter of common sense, CEMS should have been interviewed regarding the ambiguities, the contracting officer responded, "I don't know why we didn't approach CEMS." Moreover, during his testimony at trial, even accounting for the passage of time from adjudication to the trial, the contracting officer seemed remarkably unfamiliar with the relevant back up documents.

Finally, the contracting officer even denied claims in which government error or changes were acknowledged. For example, in the contracting officer's final decision, the contracting officer noted that, regarding Claim F29, the "PE [the government's project engineer] was in error in the manner of payment," but nevertheless denied CEMS additional compensation, finding that the claim had "no merit."

Thus, the pattern of detachment of the contracting officer from the claim adjudication decision making process reflected in the record in this case demonstrates that the contracting officer released his responsibility to such a degree that his actions, or inactions, were unreasonable. Although a contracting officer may review claims using in-house assistance, he must still understand and be persuaded by the determinations made in his contracting officer's final decision. *See Impresa Construzioni Geom. Domenico Garufi v. United States*, 52 Fed.Cl. 421, 427 (200) (the contracting officer acted unreasonably in adjudicating a bid-protest by relying on the technical evaluation board's recommendation without independently investigating or verifying the information provided to him). The contracting officer in this case failed to conduct an independent review and take ownership of the decisions delegated to him by the agency when he failed to familiarize himself with the contracting officer's final decision, which he nevertheless signed. *See SIPCO Servs. & Marine Inc. v. United States*, 41 Fed.Cl. 196, 220–21 (1998) (a contracting officer cannot abdicate to others his or her obligation to make decisions). Accordingly, this court finds that the government's actions on the part of the contracting officer during review of the claims submitted were not substantially justified.

## C. Defendant's Litigation Position

In making a determination as to whether the government's litigation position was substantially justified, this court reviews below the claims upon which the plaintiff prevailed. The remaining claims were either acknowledged by the government and paid at the administrative level, settled, or were tried and the government prevailed.

### 1. Claim A2

Claim A2 concerned whether the government breached its implied duty to cooperate due to plaintiff's allegation that delay occurred as a result of excessive supervision or control of the finishes of the subgrade and aggregate base course. Plaintiff based its theory of recovery on two alternate theories. Plaintiff first asserted that the government misinterpreted the contract when the government required acceptance of subgrade finishes in accordance with the tolerances set forth in subparagraph 204.13 of the Standard Specifications for Construction of Roads and Bridges on Federal Highway Projects (FP 96). In response to this theory, the government argued that, as a matter of contract interpretation, plaintiff was incorrect, and that the government did not require plaintiff to perform beyond the contract specifications. In its trial opinion, this court rejected plaintiff's first theory regarding subparagraph 204.13, and found that plaintiff failed to establish that the government required finishing in excess of the requirements specified in that section of the contract.

On its second theory, however, the plaintiff prevailed. Plaintiff asserted that the government rejected subgrade and aggregate finishes which were within contract tolerances. In response to plaintiff's second theory, the government argued that plaintiff failed to provide any evidence proving that the government sought to enforce tolerances beyond the contract specifications and that where the government changed grades, plaintiff was compensated. Regarding plaintiff's second theory, this court ruled in favor of the plaintiff, finding that the government failed to rebut plaintiff's second claim that the government breached the implied duty of cooperation when it used improper measuring tools and changed the grades to which plaintiff was required to finish surfaces. *CEMS, Inc. v. United States,* 59 Fed.Cl. at 201.

The government contends that its defense to Claim A2 was, nevertheless, substantially justified because this court's ruling was based on a determination of witness credibility. In support of this contention, the government cites to *Manno v. United States,* 48 Fed.Cl. 587 (2001). In *Manno,* the court declined to award EAJA fees to the plaintiff, reasoning that its decision in the underlying litigation was based on "observations and evidence that could only be obtained during trial...." *Id.* at 591 (citing *United Constr. Co. v. United States,* 11 Cl.Ct. 597, 601 (1987)). However, as the trial opinion issued in the CEMS case indicates, this court's determination that plaintiff met its burden of proof was based on both "the testimony and documents in the record," *CEMS, Inc. v. United States,* 59 Fed.Cl. at 201, including the language of the contract, witness testimony, and the construction diaries. *Id.* at 200–01. Thus, unlike cases in which a court's determination turns primarily on evidence that could only be ascertained at trial, this court's decision was based on review of the contract language and the construction diaries, which were further explained by witnesses at trial.

Also critical to the court's decision in favor of the plaintiff was the fact that the government failed to make an affirmative argument to support its defense of Claim A2. Indeed, in its post-trial brief the government based its entire defense on the insufficiency of plaintiff's evidence. Thus, once this court determined that plaintiff had met its burden of proving that the government breached the implied duty of cooperation by using improper measuring tools and changing grades, the plaintiff prevailed on that issue. *Id.* As a result, the government has failed to meet its burden of demonstrating that its defense to Claim A2 was substantially justified.

### 2. Claim A11 and A14 pay item 21101

These claims concerned whether CEMS performed additional roadway obliteration on the bicycle path project which was not included in the contract estimated pay item of

150 square meters. The government argued that although CEMS may have had to remove more asphaltic concrete on the bicycle path than specified in the contract, the excess asphaltic concrete should have been considered as roadway excavation, not roadway obliteration. The contract defined roadway excavation in subsection 204.02(1)(a) of FP–96 as "all material encountered regardless of its nature or characteristics." *CEMS, Inc. v. United States,* 59 Fed.Cl. at 204. The only exclusions dealt with excavation for the building of structures and subexcavation. On the other hand, the contract defined roadway obliteration under subsection 211.01 as consisting of "obliterating and recontouring roadways." *Id.* Ultimately, this court concluded in its trial opinion that the asphalt removal was not governed by the general language of Section 204, but was governed by the specific language of Section 211. *CEMS, Inc. v. United States,* 59 Fed.Cl. at 204.

The government contends that its interpretation of the contract was reasonable because the provisions for roadway excavation only provided exclusions for the building of structures and subexcavation. Because asphalt is a "material," the government argued that it was governed by subsection 204.02(1)(a) of the contract and that it was reasonable for the defendant to conclude that the asphalt removal would be treated as roadway excavation. CEMS, however, asserts that this interpretation was not reasonable because the court ruled against the government, "[b]ased on the evidence presented at trial, and a plain reading of the contract documents . . . ." *CEMS, Inc. v. United States,* 59 Fed. Cl. at 205. CEMS, therefore, argues that the contract was "unambiguous and the *only* reasonable interpretation was the one advocated at all times by CEMS."

To bolster its argument, CEMS cites *Gutz v. United States,* 45 Fed.Cl. 291 (1999). In *Gutz,* this court found that the government breached its settlement agreement with the plaintiffs. *Id.* at 297. In reaching its decision, the court found that the contract was clear and unambiguous on its face and that the government's interpretation was one that could not reasonably be derived from the language of the contract. *Id.* at 298. As a result, the court found that the government's interpretation of the contract, and, therefore, its litigation position, was not substantially justified. *Id.* at 302.

Unlike *Gutz,* the court in the present case did not find that the contract language was clear and unambiguous on its face. To the contrary, interpretation of the contract with CEMS implicated complicated legal and factual issues and was anything but clear and unambiguous. This court's ruling, therefore, was based not only on a reading of the contract, but also on evidence presented at trial. As a result, this court concludes that the government's positions on Claims A11 and A14 pay item 21101, although ultimately incorrect, were substantially justified.

### 3. Claims D5, D8, H6, F18, and A14

The remaining claims were for excessively wet material at Station 6+258 to Station 6+810 (D5), additional mobilization costs (D8), change in location of concrete barriers (H6), saw cutting concrete (F18), and the roadway excavation and minor hot asphalt concrete pay items under Claim A14. Concerning these items, the government made no attempt to provide a defense, explanation, or substantiation for its prelitigation or litigation position. The standard for reviewing whether the government's litigation position was substantially justified requires the defendant to demonstrate that the government acted reasonably during the dispute. *See Baldi Bros. Constructors v. United States,* 52 Fed.Cl. 78, 82 (2002) (holding that the government cannot demonstrate that its position was substantially justified when it refused to address its conduct at all) (citing *Griffin & Dickson v. United States,* 21 Cl.Ct. 1, 6–7 (1990)). Similarly, here the government cannot demonstrate that its conduct was reasonable when the government refuses to address its conduct at all. *Id.*

### D. Government's Overall Position

The final issue presented is whether the government's overall position was substantially justified, given the government's success in defending against a significant number of plaintiff's claims. The government was not substantially justified with respect to

the conduct of the contracting officer when reviewing the claims filed by the plaintiff with the agency, and in his issuance of a contracting officer's final decision without sufficiently exercising his independent judgment. Also, with respect to the manner in which the government defended against certain of the plaintiff's claims, the government offered no defense or found some 26 claims and 16 individual bid items worthy of settlement which, given the contracting officer's detachment, might well indicate that if the contracting officer had properly reviewed those claims, the plaintiff may not have had to file suit on those claims. Certainly, refusal to settle claims pre-trial is not, by itself, unjustified. The contracting officer's disengaged manner in handling the contractor's claims submitted to the agency was sufficiently serious to cause substantial damage to the government's argument that it was substantially justified in its conduct during the case. The contracting officer's detachment from the case prevented a reasonable and fair adjudication and resolution of the claims at the administrative level, compelling CEMS to litigate the remaining claims before this court. The record indicates that had the contracting officer carefully reviewed and made independent judgments in arriving at his contracting officer's final decision, he may have acknowledged the validity of more of the plaintiff's claims at that time.

The agency's conduct would not necessarily result in an award of EAJA fees, if the government's later litigation position was substantially justified to a degree that cured this initial conduct. *See Baldi Bros. Constructors v. United States*, 52 Fed.Cl. at 82 ("[I]n appropriate circumstances, the court would not be disinclined to find that the Government's position during litigation outweighed its prelitigation conduct so as to support a finding that it acted with substantial justification.") (citations omitted). This court, however, has found that the government was not correct in its defense of seven of the plaintiff's claims and bid items brought to trial. Indeed, the government was unable and failed to articulate a reason for defending against six of the claims in this case. Thus, although the government is not required to be substantially justified in every

position it takes during a civil action, this court is of the opinion that the deficiencies of the government's actions in this case were substantial when taken together with the contracting officer's failure to properly exercise his discretion and engage in the claim review process. Given the overall impact and importance of the contracting officer's role, his abdication of responsibility and the inability or failure of the government to defend on these issues, the government's overall position was tainted sufficiently to meet the test for recovery by the plaintiff under EAJA. *See Roanoke River Basin Ass'n v. Hudson*, 991 F.2d at 139. Accordingly, this court finds that the government's overall position in this case was not substantially justified.

## III. Amount of Damages

### A. Apportionment

■ Although the United States Supreme Court has suggested that when making a determination of whether the government's position was substantially justified, trial and appellate courts should consider the case as a whole, the Court has retained the option of adjusting EAJA fees downward to account for the varying degrees of success achieved by the petitioner during various phases of litigation or on specific issues during litigation. *See Hensley v. Eckerhart*, 461 U.S. at 436–37, 103 S.Ct. 1933; *see also Comm'r I.N.S. v. Jean*, 496 U.S. at 163 n. 10, 110 S.Ct. 2316 (the *Hensley* standard of reasonableness of fees applies to EAJA). The *Hensley* Court also wrote that "where a plaintiff has obtained 'excellent results,' his attorney should recover a fully compensatory fee," and that "the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit." *Hensley v. Eckerhart*, 461 U.S. at 435, 103 S.Ct. 1933.

■ In determining whether a plaintiff achieved excellent results, in the words of the *Hensley* case, it is not dispositive that the plaintiff in the present case prevailed on only 9 of the 30 claims and individual bid items actually litigated, and received only somewhat less than 24 percent of the damages

sought at trial. *KMS Fusion v. United States*, 39 Fed.Cl. at 601. However, awarding plaintiff all of the attorney fees would result in a "recovery out of proportion to its actual success." *Baldi Bros. Constructors v. United States*, 52 Fed.Cl. at 83. On this basis, the court finds that the plaintiff is not entitled to all of the attorney fees claimed. *See KMS Fusion v. United States*, 39 Fed.Cl. at 601.

The United States Court of Appeals for the Federal Circuit has adopted a mechanism for trial courts to award attorney fees on a pro rata basis. *See Cmty. Heating & Plumbing Co. v. Garrett*, 2 F.3d at 1146. First, this court must determine whether awarding partial fees is practical based on the thoroughness of plaintiff's billing records. *See Naporano Iron & Metal Co. v. United States*, 825 F.2d 403, 405 (Fed.Cir.1987) (trial courts do not have a duty to reconstruct a plaintiff's inadequate bills); *see also Nadeau v. Helgemoe*, 581 F.2d 275, 279 (1st Cir.1978) (finding that a trial court has significant discretion to reduce a fee award when a plaintiff's records "do not provide a proper basis for determining how much time was spent on particular claims."). In the CEMS case currently before the court, the plaintiff's records are typical billing records that are sufficiently detailed to support an award of attorney fees. *KMS Fusion v. United States*, 39 Fed. Cl. at 601; *see also Beta Systems, Inc. v. United States*, 866 F.2d 1404, 1406 (Fed.Cir. 1989) (noting that plaintiff need only provide typical billing records to comport with statutory and case law requirements).[3]

Although the plaintiff's billing records are sufficient to avoid a denial or reduction of EAJA awards based on deficiencies in the plaintiff's records, the records in this case do not segregate the amount of time plaintiff actually spent on the issues on which the plaintiff prevailed. Thus, this court must determine the appropriate reduction based

on its determination of what would be reasonable in light of the plaintiff's more limited success. In making this determination, the United States Supreme Court in *Hensley v. Eckerhart* found that EAJA awards should not be reduced according to a mathematical ratio that compares the number of issues upon which the plaintiff actually prevailed with the total number of issues in the case. *Hensley v. Eckerhart*, 461 U.S. at 435 n. 11, 103 S.Ct. 1933. The Federal Circuit also found in *Naekel v. Department of Transportation* that trial courts may not reduce awards by a fraction corresponding to the number of briefing pages devoted to successful versus unsuccessful issues, noting that the number of pages of argument does not necessarily indicate the significance of the issue. *Naekel v. Dep't of Transp.*, 884 F.2d 1378, 1379–80 (Fed.Cir.1989).

Notwithstanding these restrictions on fee calculations, the Supreme Court has stated that trial courts have significant discretion in awarding attorney fees because of their "superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters." *Comm'r I.N.S. v. Jean*, 496 U.S. at 161, 110 S.Ct. 2316 (quoting *Hensley v. Eckerhart*, 461 U.S. at 437, 103 S.Ct. 1933). In exercising such discretion, "[t]here is no precise rule or formula for making these determinations. The trial court may attempt to identify specific hours that should be eliminated, or may simply reduce the award to account for the limited success. The court necessarily has discretion in making this equitable judgment." *Hensley v. Eckerhart*, 461 U.S. at 436–37, 103 S.Ct. 1933.

This court, therefore, bases its determination on having worked with the parties through the pre-trial, trial, and post-trial proceedings, including having reviewed the parties' pleadings and pre-trial status re-

---

**3.** Plaintiff in the case currently under review requests fees for 454.7 hours of work performed by paralegals. Generally, courts have found that fees for work performed by paralegals are only recoverable to the extent they reflect tasks traditionally performed by an attorney and for which the attorney would customarily charge the client. *See, e.g., Hyatt v. Barnhart*, 315 F.3d 239, 255 (4th Cir.2002) (citing *Allen v. United States Steel*

*Corp.*, 665 F.2d 689, 697 (5th Cir.1982)); *Jean v. Nelson*, 863 F.2d 759, 778 (11th Cir.1988), *aff'd*, 496 U.S. 154, 110 S.Ct. 2316, 110 L.Ed.2d 134(1990). This court notes that the plaintiff complied with this rule by only requesting paralegal fees that reflect tasks traditionally performed by an attorney and for which the attorney would customarily charge the client.

ports, monitored settlement efforts, and conducted the pre-trial efforts, as well as the trial proceedings and reconsideration. *See KMS Fusion v. United States*, 39 Fed.Cl. at 603. The court commends the work of both parties to arrive at a settlement of some of the claims raised in plaintiff's complaint. Normally, a court should applaud settlement initiatives and avoid penalizing the government for engaging in settlement efforts. *Id.* at 598 ("The court is cognizant of the chilling effect that would result from a rule of law whereby the government makes itself vulnerable to an EAJA award when it enters into settlement negotiations."). This case, however, is unique in that the failure of the contracting officer to meet his claim review responsibilities forced issues to trial, including issues on which defendant did not prevail, which plaintiff might well have been able to resolve had the contracting officer performed a proper review. Plaintiff, however, has failed to allocate attorney time commitments regarding settlement efforts in their EAJA application. This court, therefore, does not award attorney fees regarding those claims which the government settled prior to trial.

After review of plaintiff's EAJA application, as well as the issues before the court, the court finds that the issues on which the government was not substantially justified accounted for approximately one quarter of the parties' efforts, reflected, in part, in the apparent relative relationship in this case of efforts to claims. This court, therefore, reduces the EAJA award to 25 percent of the amount of EAJA fees claimed by the plaintiff.

■ In addition, plaintiff requests compensation of $454.75 for work its attorneys performed prior to issuance of the contracting officer's final decision. Those fees, however, are not recoverable through an EAJA application. *Levernier Constr., Inc. v. United States*, 947 F.2d 497, 502 (Fed.Cir.1991) ("Both of these amendments to the EAJA show that, at its earliest, EAJA coverage may begin after the decision of and in pursuit of an appeal from the decision of a contracting officer."). Accordingly, this court reduces plaintiff's attorney fees by an additional $454.75.

**B. Cost of Living Adjustment**

■ EAJA establishes a statutory cap of $125.00 per hour, but allows for adjustments above the statutory cap, if "the court determines that an increase in the cost of living ... justifies a higher fee." 28 U.S.C. § 2412(d)(2)(A)(ii). Defendant has raised no objection to a cost of living increase by not addressing it in their response to plaintiff's EAJA application. An increase in the rate of attorney fees to account for cost of living adjustments (COLAs) may be awarded at the discretion of the court. *See KMS Fusion v. United States*, 39 Fed.Cl. at 603 (citing *Oliveira v. United States*, 827 F.2d 735, 742 (Fed.Cir.1987)). The base date from which to begin the calculation of a COLA is the effective date of the $125.00 statutory cap, March 29, 1996. *See California Marine Cleaning, Inc. v. United States*, 43 Fed.Cl. 724, 733–34 (1999) ("Although the Federal Circuit and other circuits have advocated use of October 1981 as the appropriate baseline, the selection of that particular month was tied indivisibly to the October 1, 1981 effective date of the $75 statutory cap in effect at the commencement of the underlying litigation. The EAJA, however, was amended in 1996, raising the statutory cap to $125.... Consequently, in the case currently before the court, March 1996 is the proper baseline for calculation of a COLA to the $125 cap.") (citations omitted). The end date for the calculation of COLAs is the date legal services were finally rendered. *Id.* (citing *Doty v. United States*, 71 F.3d 384, 387 (Fed.Cir. 1995)). A COLA award justifiably offsets the decrease in the value of the $125.00 rate due to inflation. In *California Marine Cleaning, Inc. v. United States*, the court declined "to impose a requirement that an applicant must do more than request such an adjustment and present a basis upon which the adjustment should be calculated." *California Marine Cleaning, Inc. v. United States*, 43 Fed.Cl. at 733 (citations omitted).

This court finds that a COLA award is justified in the present case. The plaintiff requested a COLA to its attorney fees paid from 1999 through 2004 based on the consumer price index. *Id.* at 734 (taking judicial

notice of the consumer price index for calculating EAJA awards). District courts generally determine the COLA by multiplying the basic EAJA rate of $125.00 by the current consumer price index for urban consumers (CPI–U), and then dividing the product by 155.7, the CPI–U for March, 1996 when the cap was imposed. *See Phillips v. General Services Admin.*, 924 F.2d 1577, 1583 (Fed. Cir.1991) (holding that EAJA petitioners are entitled to attorney fees under EAJA in a lodestar amount determined by multiplying the hours by the statutory rate increased to reflect the cost of living increase from the effective date of the passage of EAJA to the date services were performed); *see also Gonzalez v. United States*, 44 Fed.Cl. 764, 770 (1999) (measuring the COLA using the CPI–U). Because the number of hours expended varied significantly for each year in which a COLA was requested, this court calculated the COLA separately for each year that services were provided. *See California Marine Cleaning, Inc. v. United States*, 43 Fed.Cl. at 734 (noting that COLAs may be calculated separately for each month that services are provided, but that when the hours expended are approximately even for the applicable time period a single rate may be used); *see also Masonry Masters, Inc. v. Nelson*, 105 F.3d 708, 709–10 (D.C.Cir.1997) (finding that the COLA should be calculated separately for each year that services were provided).[4]

After performing the appropriate computations, this court finds that the hourly rate should be enhanced to $133.75 for 1999, $138.25 for 2000, $142.18 for 2001, $144.42 for 2002, $147.71 for 2003, and $151.65 for 2004.[5] As recalculated, the total EAJA award requested by plaintiff would be $230,053.57.[6] This court thus reduces that amount based on this court's finding that the award should be adjusted to 25 percent of the award requested to account for the plaintiff's limited success, or $57,513.39. This amount is then reduced by an additional $454.75 to account for the time spent before the issuance of the contracting officer's final decision. This results in a fee award to the plaintiff of $57,058.64.

## CONCLUSION

For the foregoing reasons, the court finds that the plaintiff is entitled to EAJA attorney fees. Based on the above computations, the Clerk of the Court shall enter **JUDGMENT** awarding the plaintiff EAJA fees in the amount of $57,058.64.

**IT IS SO ORDERED.**

---

4. This court notes that, theoretically, the COLA could be calculated separately for each month that services were performed. However, although the hours expended varied from year to year, they appear, nevertheless, to have been distributed approximately evenly throughout each year, justifying use of the average CPI–U for each year.

5. Despite this court's best efforts, it could not duplicate the COLA adjusted fees provided by plaintiff. This court, therefore, calculated the enhanced rate using its own formula as follows:
   1999: $125 × 166.6/155.7= $133.75
   2000: $125 × 172.2/155.7= $138.25
   2001: $125 × 177.1/155.7= $142.18
   2002: $125 × 179.9/155.7= $144.42
   2003: $125 × 184.0/155.7= $147.71
   2004: $125 × 188.9/155.7= $151.65

6. This amount includes $55,484.50 in appropriate paralegal fees, following review by the court, which are not subject to a COLA. *See Levernier Constr. v. United States*, 947 F.2d at 503 (holding that a COLA is not available for paralegal awards). The remainder of the award is for attorney fees and was calculated as follows:

| Year | Hours | Rate | Award |
|---|---|---|---|
| 1999: | 14.4 | $133.75 | $ 1,926.00 |
| 2000: | 315.8 | $138.25 | $ 43,659.35 |
| 2001: | 188.5 | $142.18 | $ 26,800.93 |
| 2002: | 435.4 | $144.42 | $ 62,880.47 |
| 2003: | 232.3 | $147.71 | $ 34,313.03 |
| 2004 | 32.9 | $151.65 | $ 4,989.29 |
| Total Attorney Fees (COLA): | | | $174,569.07 |

Therefore, $174,569.07 plus $55,484.50 equals $230,053.57.